The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Anthony Lolin JIMENEZ,
Defendant–Appellant.

No. 04CA1098.

Colorado Court of Appeals,
Div. VI.

Oct. 16, 2008.

Rehearing Denied Dec. 31, 2008.

John W. Suthers, Attorney General, Laurie A. Booras, First Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Michael J. Heher, Captain Cook, Hawaii, for Defendant–Appellant.

Opinion by Judge J. JONES.

Defendant, Anthony Lolin Jimenez, appeals the judgment of conviction entered on jury verdicts finding him guilty of second

degree murder and accessory to a crime. Though defendant raises a host of issues on appeal, we perceive no reversible error, and therefore affirm.

## I. Background

The following historical facts are supported by evidence presented at trial and are consistent with the jury's verdicts. Procedural facts are taken from the pleadings, court orders, and transcripts of proceedings.

On August 20, 2000, defendant, Michael Easton, Nick Olan, and three other individuals began a "camping trip." Over the next few days, they smoked marijuana and drank alcohol at the campsite. Easton testified that during the camping trip he and defendant stole from a Home Depot store twice and a Hobby Lobby store once, and burglarized a cabin, to get money to buy alcohol, marijuana, cigarettes, and "supplies." Olan was with them during one of the Home Depot thefts, the Hobby Lobby theft, and the cabin burglary, but defendant and Easton dropped him off near his house on August 23. By that day, defendant and Easton were the only members of the original group still camping at the campsite.

On August 24, defendant and Easton picked up a fifteen-year-old girl, J.B., whom they did not know, on a street in Colorado Springs. They took her to the campsite where they held her for two days. Easton testified that both he and defendant sexually assaulted J.B., and that defendant suggested they kill J.B. because she "knew too much." Defendant bound J.B. with duct tape, and he and Easton carried J.B. to a stream where they drowned her. Defendant and Easton then removed J.B.'s clothing and jewelry as well as the duct tape, put her body in a sleeping bag, and drove to a small ravine near Trail Creek Road in Teller County, where they left J.B.'s body.

Late on September 8, 2000, defendant went to the Pikes Peak Mental Health Center (PPMH), in Colorado Springs. He told a counselor that he was having "visions" of a teenage girl being sexually assaulted and murdered by two men, and that he wanted her to ask the police to come get him so he could show them where the girl's body was.

The counselor called the Teller County Sheriff's Office.

After a sheriff's deputy arrived at PPMH, defendant told the deputy what he had told the counselor. Defendant offered to go with the officer to find the victim's body. He, the deputy, and a sheriff's office sergeant then searched the Trail Creek Road area. Defendant directed them to several sites where they found nothing, but eventually he directed them to the victim's body. The officers then handcuffed defendant, took him into custody, and transported him to the Teller County Sheriff's Office.

Another sheriff's office sergeant and a district attorney's office investigator questioned defendant at length on September 9 and, at defendant's request, took him to a campsite where he said he and Easton had camped. At about 6:30 p.m. that day, the sergeant and the investigator arrested defendant. After they booked him into jail, they took him to a hospital to give biological samples. After defendant gave the biological samples, he directed the sergeant and the investigator to where he and Easton had "picked up" the victim.

The next day, defendant again asked to speak with the sergeant and the investigator. Defendant then related additional details about his visions and the incident.

The People charged both defendant and Easton with first degree murder, kidnapping, sexual assault, and conspiracy. The prosecution indicated that the People intended to seek the death penalty against both men. Easton entered into a plea agreement with the People, in which he agreed to plead guilty to second degree murder and second degree kidnapping and to testify truthfully in defendant's trial in exchange for a stipulated sentence of seventy-three years in the custody of the Department of Corrections and dismissal of all other charges.

Defendant's first trial ended in a mistrial. Before defendant's second trial, the prosecution decided not to seek the death penalty.

Defendant's theory of defense at trial was that the victim had willingly gotten into the car with him, Easton, and Olan; he never

participated in preventing the victim from going anywhere; he did not sexually assault her or know that Easton or Olan had done so; and although he was physically present during the events leading to the victim's death, he did not cause her death or intend to kill her.

The jury in the second trial found defendant guilty of the lesser included offense of second degree murder and the lesser noncluded offense of accessory to a crime, but was unable to reach verdicts on the kidnapping, sexual assault, and conspiracy charges. The court sentenced defendant to forty-eight years in the custody of the Department of Corrections on the murder conviction and six years incarceration on the accessory conviction, to be served consecutively.

## II. Alleged Violations of 42 U.S.C. § 290dd–2

Defendant contends that the prosecution obtained his patient records from PPMH in violation of 42 U.S.C. § 290dd–2 (2008) (the federal statute) and its related regulations, *see* 42 C.F.R. §§ 2.1–2.67, and improperly used them to investigate the case and as evidence in pretrial hearings and at trial. He further contends that because of the prosecution's allegedly illegal conduct in obtaining and using the records, his convictions must be reversed and all charges against him must be dismissed. We are not persuaded.

The federal statute provides that certain records of substance abuse treatment are to remain confidential, and may be disclosed only in certain specified circumstances. At issue are four categories of "records" allegedly covered by the federal statute: (1) defendant's statement to the counselor on the night of September 8 and 9, 2000 when he reported having "visions"; (2) the counselor's statements about defendant in her telephone call to the sheriff's office on the night of September 8 and 9; (3) the entirety of PPMH's file on defendant, which was provided to an investigator on September 12, 2000 pursuant to a release of medical records executed by defendant; and (4) nineteen pages from that file which the court determined were tantamount to a report of child abuse, therefore not covered by the federal statute, and therefore available for use by the prosecution. These categories of "records" are more specifically described as follows:

(1) *Defendant's statements to the counselor.* Defendant told the counselor he was having "visions" of a girl being raped and murdered by two men. He wanted to be evaluated to determine whether these "visions" were "from God" or "hallucinations." Defendant described the girl in his visions and described the murder in general terms. He said he thought her name began with "Jo" or "Je." When the counselor asked him whether he had recently used drugs or alcohol, he responded that he had not. He said he sometimes obtained medication from PPMH, that he was taking his medications regularly, and that he was seeing a psychiatrist more or less regularly. He repeatedly asked the counselor to call the police so he could lead them to the girl's body. The court found these statements were part of a report of child abuse and therefore not subject to the prohibitions on disclosure and use imposed by the federal statute.

(2) *The counselor's statements to the police.* As noted, at defendant's request, the counselor called the Teller County Sheriff's Office. She said that defendant was at PPMH saying he was having visions of a teenage girl being murdered about three days earlier, he could show the police where the victim's body was, and he wanted to meet the police so he could help them find the body, which he thought was in a creek bed somewhere in the Woodland Park area. The counselor also said defendant had been a "client" of PPMH "for quite a long time," and defendant had told her he had bipolar disorder, was taking medication for his disorder, was seeing a psychiatrist, and was keeping up with his treatment program. She indicated defendant appeared very anxious, but was "lucid." She also said she was calling at defendant's request. At the end of the telephone call, she said defendant was "pacing anxiously waiting for you guys to get here" and was "eager to see you." The court ruled that these statements also constituted a report of child abuse.

(3) *Defendant's PPMH file.* The file included defendant's treatment records going back several years. Investigators obtained the file, which was in a sealed envelope, from PPMH on September 12, 2000 pursuant to a written release form signed by defendant. Three days later, the court issued an order sealing the file and ordering that it be turned over to the court. The prosecution immediately complied with the order.

(4) *Nineteen pages from the PPMH file.* These pages contained notes regarding defendant's conversations with PPMH personnel on the night of September 8 and 9, 2000. The court turned them over to the prosecution after determining they were a report of child abuse and therefore not privileged under the federal statute. However, the court redacted them before turning them over to the prosecution to delete any information not relevant to the report of child abuse.

Though defendant contends these "records" were used extensively by the prosecution throughout the case, the district court record reflects that the prosecution's use of the statements and documents was much more limited than defendant represents. It does not appear that any of the documents was used at any hearing or at trial, save possibly for the hearings on whether the prosecution could see and use the documents. Further, though defendant alleges that the prosecution thoroughly reviewed the entire PPMH file before turning it over to the court, the only statement in the district court record pertaining to any review is one by a prosecutor who said the file had been "cursorily reviewed" on September 12, 2000 very shortly after the prosecution received it from PPMH. There is no indication that, except for the nineteen redacted pages later given to the prosecution by the court, the prosecution or the police had any access to the file after it was turned over to the court.

During the preliminary hearing, the hearing on defendant's challenge to the prosecution's access to and use of the statements and documents, the hearings on defendant's motions to suppress, and the trial, sheriff's deputies and sergeants testified that the counselor had called the sheriff's office and said that a person claiming to be having visions of a teenage girl being raped and murdered wanted to show police where the body was. They did not testify as to anything else the counselor said; however, the audiotape of the telephone conversation was admitted as an exhibit during the suppression hearings. We also note that some of the testimony about the telephone call was elicited by defendant's counsel.

The counselor testified at trial as to her conversations with defendant late during the night of September 8 and 9, 2000. The prosecutor referred to that testimony in closing argument, saying essentially that defendant's statements to the counselor were part of his effort to deflect responsibility for the crimes.

It is against this factual backdrop that we evaluate defendant's arguments based on the federal statute. As relevant here, the statute provides:

(a) Requirement

Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e) of this section, be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section.

(b) Permitted disclosure

(1) Consent

The content of any record referred to in subsection (a) of this section may be disclosed in accordance with the prior written consent of the patient with respect to whom such record is maintained, but only to such extent, under such circumstances, and for such purposes as may be allowed under regulations prescribed pursuant to subsection (g) of this section.

(2) Method for disclosure

Whether or not the patient, with respect to whom any given record referred to in subsection (a) of this section is maintained, gives written consent, the content of such record may be disclosed as follows:

. . .

(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor, including the need to avert a substantial risk of death or serious bodily harm. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

(c) Use of records in criminal proceedings

Except as authorized by a court order granted under subsection (b)(2)(C) of this section, no record referred to in subsection (a) of this section may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient.

(d) Application

The prohibitions of this section continue to apply to records concerning any individual who has been a patient, irrespective of whether or when such individual ceases to be a patient.

(e) Nonapplicability

. . .

The prohibitions of this section do not apply to the reporting under State law of incidents of suspected child abuse and neglect to the appropriate State or local authorities.

(f) Penalties

Any person who violates any provision of this section or any regulation issued pursuant to this section shall be fined in accordance with Title 18.

(g) Regulations

Except as provided in subsection (h) of this section, the Secretary shall prescribe regulations to carry out the purposes of this section. Such regulations may contain such definitions, and may provide for such safeguards and procedures, including procedures and criteria for the issuance and scope of orders under subsection (b)(2)(C) of this section, as in the judgment of the Secretary are necessary or proper to effectuate the purposes of this section, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

. . .

As we understand defendant's contentions, he asserts that the statements and documents at issue constitute "records" covered by the federal statute; he did not execute a valid written consent for disclosure; none of the records was subject to the statutory exception for reports of child abuse; even if some of the records were subject to the statutory exception for reports of child abuse, the court did not order disclosure of those records in accordance with applicable regulations; and even if some of the records were subject to the statutory exception for reports of child abuse, under subsection (c) of the federal statute, the prosecution could not use the records to initiate or substantiate criminal charges against him, but did so.

### A. "Records"

42 C.F.R. § 2.11 defines "records" for purposes of the federal statute as "any information, whether recorded or not, relating to a patient received or acquired by a federally assisted alcohol or drug program." Defendant contends that, in addition to all documents in his patient file, all his statements to the counselor were "records" under this seemingly broad definition because he was a patient of PPMH and they were made to PPMH personnel.

Subsection (a) of the federal statute, however, limits the covered "records," as relevant here, to those concerning "the identity,

diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or actively relating to substance abuse ... treatment [or] rehabilitation...." Seizing on this more limited language, the People contend that defendant's statements to the counselor, which the counselor relayed (in part) to the police and recorded for defendant's PPMH file, were not covered records because they were not made for the purpose of seeking treatment or rehabilitation. In so arguing, the People rely on two cases which they contend involved similar statements, *Hurt v. State*, 694 N.E.2d 1212 (Ind.Ct.App.1998), and *State v. Johnson*, 163 Ohio App.3d 132, 836 N.E.2d 1243 (2005). We agree with the People in part.

Initially, we observe that the People apparently do not contest that defendant was a patient of PPMH who had been receiving substance abuse treatment. Nor do the People contend that PPMH is not a facility assisted by a federal department or agency.

In *Hurt*, the defendant told a hospital employee that he had murdered someone fourteen years before. The Indiana Court of Appeals held that the statements were not covered by the federal statute because there was no evidence the defendant was being treated for alcohol abuse when he made the statements or that he made the statements for the purpose of diagnosis or treatment. *Hurt*, 694 N.E.2d at 1215–17.

In *Johnson*, the defendant made incriminating statements to a treatment facility social worker during the course of a drug, alcohol, and mental health assessment. The Ohio Court of Appeals held that the incriminating statements were not covered by the federal statute because there was no evidence the statements directly related to drug abuse or alcohol abuse, as defined in 42 C.F.R. § 2.11. *Johnson*, 836 N.E.2d at 1245–47, 1251–55.

The facts in this case are somewhat different from those in *Hurt* and *Johnson*. Here, defendant, in contrast to the defendant in *Hurt*, was a patient of a facility and had received treatment for substance abuse from that facility in the past. Also, here, defendant's "visions" were relevant to his treatment because he expressly asked for an evaluation to determine their cause or source and the counselor performed such an evaluation. Thus, this case is also arguably distinguishable from *Johnson*.

Defendant's statements describing his "visions" and his mental health and treatment history would appear to fall within the statutory meaning of "records." However, defendant's statements that he wanted the counselor to contact the police and tell them he wanted to lead them to the victim's body were not related to treatment for drug or alcohol abuse. There is no indication in the record that those statements were relevant to the counselor's evaluation.

### B. Consent to Release of Records

The district court found that the written release of medical records signed by defendant was not sufficient under subsection (b)(1) of the federal statute and 42 C.F.R. § 2.31, and therefore defendant had not consented to disclosure of his PPMH file. The People do not contest this point on appeal. Nonetheless, as discussed below, the absence of valid written consent is ultimately irrelevant in this case.

### C. Report of Child Abuse

As noted, 42 U.S.C. § 290dd–2(e) provides that "[t]he prohibitions of [the federal statute] do not apply to the reporting under State law of incidents of suspected child abuse and neglect to the appropriate State or local authorities." *See also* 42 C.F.R. § 2.12(c)(6). The district court ruled that defendant's statements to the counselor, the counselor's statements to sheriff's office personnel, and nineteen pages of defendant's PPMH file (as redacted) fell within this exception.

Defendant contends in only conclusory fashion that none of the information at issue related to an incident of suspected child abuse. He contends more specifically that his status as a patient, the counselor's evaluation, his present treatment status, his marital status, his parental status, his statements about "problems with marijuana, alcohol and other drugs," information about his recent drug use and his medication status, and his

statements about his mental health were not relevant to a report of an incident of suspected child abuse.

The People, relying on section 19–3–307(2)(h), C.R.S.2008, contend that much of what defendant described in his visions was relayed by the counselor to the sheriff's office as a report of an incident of suspected child abuse, and that certain other information (about defendant's mental health status, medications, and supposed nonviolent nature, as well as his identifying information) was part of the child abuse report because it "provide[d] a basis for assessing the credibility of the report." In so arguing, the People focus on the information disclosed by the counselor during her conversation with the police, though they also contend generally that the other information contained in the nineteen pages disclosed to them qualifies as well.

■ We agree with the People. We further conclude that much of the information conveyed by the counselor during her trial testimony was integral to a report of suspected child abuse.

Section 19–3–304, C.R.S.2008, requires certain persons, including "[m]ental health professional[s]," who have "reasonable cause to know or suspect that a child has been subjected to abuse" to "immediately . . . report" that information "to the county department or local law enforcement agency," and to follow up that report with a written report. § 19–3–304(1), (2)(m), C.R.S.2008. Section 19–3–307(2), C.R.S.2008, expressly contemplates that a report of known or suspected child abuse will include, among other things, identifying information of the victim, identifying information of the suspected abuser, the nature and extent of the victim's injuries, the source of the report, and "[a]ny other information that the person making the report believes may be helpful in furthering the purposes of" the reporting statutes. § 19–3–307(2)(a)–(c), (f), (h), C.R.S.2008.

The information the counselor conveyed during her telephone call to the sheriff's office clearly falls within the scope of Colorado's child abuse reporting statute. It included identifying information of the victim (her gender and approximate age), identifying information of defendant (his name), a general description of the victim's injuries (she had been sexually assaulted and murdered), and the victim's location (a "creek type area" outside Woodland Park). The information about defendant's background and demeanor was obviously relevant to the counselor in determining whether defendant's "visions" had any basis in reality, and she testified she conveyed that information to enable the police to assess the credibility of defendant's statements. Therefore, the district court did not err in concluding that the counselor's statements to the police constituted a report of an incident of suspected child abuse.

Likewise, the information contained in the nineteen pages pertaining to defendant's discussion with the counselor on the night of September 8 and 9, 2000 qualifies as a written report of an incident of suspected child abuse, because much of that information was identical to that the counselor conveyed during her telephone call to the police. An administrator with PPMH testified that the nineteen pages could have been disclosed as a child abuse report.

In her trial testimony, the counselor essentially related information contained in the nineteen redacted pages. Thus, that testimony concerned a report of an incident of suspected child abuse, though the testimony itself was not such a report.

### D. Legality of the Court's Disclosure Order

■ Defendant contends that even if some or all of the information in question fell within the exception for reports of incidents of suspected child abuse, the district court erred in ordering that it should be disclosed to and could be used by the prosecution because (1) an order complying with 42 C.F.R. §§ 2.63 and 2.65 was required to authorize such disclosure and use; and (2) the court's order did not comply with those regulations. We are not persuaded.

As noted, subsection (e) of the federal statute provides that the statute's prohibitions do not apply to the reporting of incidents of suspected child abuse. This provision could be construed as exempting any information

that is part of such a report from any restrictions on disclosure and use imposed by the federal statute. 42 C.F.R. § 2.12(c)(6), however, provides that while the statutory restrictions do not apply to the reporting of an incident of suspected child abuse, "the restrictions continue to apply to the original alcohol or drug abuse patient records maintained by the program[,] including their disclosure and use for civil or criminal proceedings which may arise out of the report of suspected child abuse and neglect."

Though section 2.12(c)(6) of the regulations is not a model of clarity, it would appear to sanction the reporting of an incident of suspected child abuse but prohibit the report itself, or any information qualifying as a "record" under the statute, from being used against a defendant in a criminal case arising out of the report. *See In re B.S.,* 163 Vt. 445, 659 A.2d 1137, 1142–43 (1995).

Even if we assume, however, that use of the disclosed records and related information was not permitted merely because the records qualified as a report of an incident of suspected child abuse, we conclude that the district court did not err in ordering disclosure to the prosecution or in allowing the prosecution to use the records.

Subsection (b)(2)(C) of the federal statute provides, as relevant here, that the content of covered records may be disclosed if a court determines that there is "good cause therefor." In making such a determination, the court "shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services."

42 C.F.R. § 2.63(a)(2) provides that a court may authorize disclosure pursuant to subsection (b)(2)(C) if "[t]he disclosure is necessary in connection with investigation or prosecution of an extremely serious crime, such as ... homicide, rape, kidnapping, ... or child abuse and neglect...." 42 C.F.R. § 2.65(d) sets forth procedures and criteria for orders authorizing disclosure. As most relevant here, it articulates five criteria for disclosure for the purpose of conducting a criminal investigation or prosecution: (1) the crime involved is "extremely serious"; (2) "[t]here is a reasonable likelihood that the records will disclose information of substantial value in the investigation or prosecution"; (3) "[o]ther ways of obtaining the information are not available or would not be effective"; (4) the potential injury to the defendant, the physician-patient relationship, and the ability of the program to provide services to others is outweighed by the public interest and the need for disclosure; and (5) where law enforcement authorities are seeking the records, the person holding the records had the opportunity to be represented by independent counsel.

The record in this case is not clear whether the district court made the findings required by section 2.65 of the regulations. However, the court expressly found that an order under section 2.63 would be appropriate. Even if the court did not make express findings under section 2.65, the record shows that these criteria were met with respect to the records at issue. Defendant's briefs contain no argument to the contrary. Therefore, we perceive no error in the district court's decision. *See United States v. Corona,* 849 F.2d 562, 565–66 (11th Cir.1988) (court's failure to make findings supporting good cause for disclosure of confidential records did not justify reversal of convictions because a reasonable judge could have found that the criteria in section 2.65 were met), *abrogated on other grounds by Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

### E. Remedy for Violating the Federal Statute

Though we have concluded that the "records" at issue here (defendant's statements to the counselor, the counselor's statements to the police, and the nineteen redacted pages) were properly disclosed to and used by the prosecution, we acknowledge the possibility that some information perhaps should not have been disclosed. Even were that the case, however, the extreme remedies urged by defendant, suppression of the information, reversal of his convictions, and dismissal of the charges, would not be appropriate, for at least two reasons.

■ First, the weight of authority holds that suppression of improperly obtained confidential records and dismissal of charges are not appropriate remedies for a violation of the federal statute. *See Rogers v. England,* 246 F.R.D. 1, 3 (D.D.C.2007); *State v. Jenkins,* 272 Kan. 1366, 39 P.3d 47, 61 (2002); *State v. Magnuson,* 210 Mont. 401, 682 P.2d 1365, 1369 (1984); *but see United States v. Eide,* 875 F.2d 1429, 1436–37 (9th Cir.1989) (ordering suppression of evidence covered by the federal statute). We agree with the cases in that majority.

Though subsection (c) of section 290dd–2 states that records covered by subsection (a) may not be used to initiate or substantiate any criminal charges (except as authorized by a court order), we must read the statute as a whole and endeavor to give effect to and harmonize all its provisions. *State v. Nieto,* 993 P.2d 493, 501 (Colo.2000); *People v. Garcia,* 64 P.3d 857, 860 (Colo.App.2002). Subsection (f) states that "[a]ny person who violates any provision of this section or any regulation issued pursuant to this section shall be fined in accordance with Title 18."

> The fact that a remedy is provided in the legislation indicates that Congress considered the possibility of a violation and determined the appropriate remedy for that violation. If Congress had intended that suppression and dismissal were the appropriate remedy for a violation of ... confidentiality it would have so provided.

*Magnuson,* 682 P.2d at 1369.

■ This result is consistent with the principle that suppression of evidence is a drastic remedy that is generally limited to violations of constitutional rights. *People v. Shinaut,* 940 P.2d 380, 383 (Colo.1997) (quoting *People v. Bowers,* 716 P.2d 471, 473 (Colo.1986)); *People v. Shreck,* 107 P.3d 1048, 1054 (Colo. App.2004); *see People v. Strauss,* 180 P.3d 1027, 1029 (Colo.2008). Any statutory violation here does not rise to that level.

■ Second, any error here in allowing the prosecution to use some of the information was harmless. Defendant's request that the counselor notify the police that he wanted to lead them to the victim's body and defendant's subsequent statements to investigators were not even arguably covered by the federal statute. He essentially told the deputies and investigators what he had told the counselor, including not merely information about his visions but also information about his mental health status (*e.g.,* that he went to PPMH regularly for medication and was bipolar). His wife told the investigators he was a "regular" at PPMH. Therefore, there was a permissible independent basis for the investigation in any event, the allegedly covered information was largely cumulative of other non-covered information, and defendant was not prejudiced by the disclosure of any residual covered information. *See* Crim. P. 52(a) (any error which does not affect a party's substantial rights shall be disregarded); *cf. United States v. Johnston,* 810 F.2d 841, 843–44 (8th Cir.1987) (suppression of contraband and statements arguably obtained in violation of the federal statute was not warranted where the patient records were not used to investigate the case or initiate or substantiate criminal charges); *People in Interest of R.D.H.,* 944 P.2d 660, 663–64 (Colo.App.1997) (where information subject to section 290dd–2 was cumulative of other evidence, any error in allowing testimony on that information was harmless); *Magnuson,* 682 P.2d at 1369 (same as *Johnston* ); *In re B.S.,* 659 A.2d at 1143 (where family court's use of information it obtained in violation of the federal statute was not prejudicial, reversal was not warranted).

In sum, we reject defendant's arguments based on 42 U.S.C. § 290dd–2 because (1) some of the statements at issue are not records covered by the federal statute; (2) most if not all of the statements and documents (the nineteen redacted pages) constitute reports of an incident of suspected child abuse; (3) there was good cause for disclosure and use of the records; and (4) suppression of the records and dismissal of the charges are not appropriate remedies for any violation of the federal statute that may have occurred, at least under the circumstances of this case.

### III. Disqualification of the District Attorney's Office

■ Defendant contends the district court erred in denying his motion to disqualify the district attorney's office. We disagree.

Defendant filed a number of motions to disqualify the district attorney. As relevant here, he asserted that disqualification was required because the district attorney had a "conflict of interest" arising out of defendant's allegations that persons in the district attorney's office, including investigators and prosecutors, had violated the federal confidentiality statute, 42 U.S.C. § 290dd–2, and were therefore exposed to potential criminal liability. Defendant claimed that crimes were committed when the investigators obtained defendant's records from PPMH and when prosecutors referred to covered records in various papers filed with the court. He argued the conflict existed because the prosecutors were in a position of having to defend themselves against the accusations, and that they had a personal "interest in [defendant] being dead" so they would not face criminal investigations and prosecution, potential loss of their law licenses, and a civil suit by defendant.

Defendant also alleged that the facts created a "gross appearance of impropriety" on the prosecutors' parts. This allegation also was premised on the prosecutors' alleged violations of the federal statute.

Following several hearings, the district court denied the motions to disqualify. The court relied, in part, on its prior rulings that the counselor's telephone call to the sheriff's office and the redacted nineteen pages were subject to disclosure without defendant's consent, and therefore the authorities did not violate the law in obtaining them. As for the other portions of defendant's PPMH file, the court ruled that while those records were not obtained by the investigators in compliance with the federal statute, the appropriate remedy was exclusion of the remainder of the file (as previously ordered by the court) rather than disqualification of the prosecutors' office. The court observed that the investigators acted in good faith because defendant's written release complied with state law, and that acquisition of the records therefore did not constitute theft of medical records as alleged by defendant.

The court ultimately found that defendant had failed to establish (1) that the prosecutors had any interest in the case beyond that of upholding the law, (2) that there was an appearance of impropriety, (3) or that his right to a fair trial would be jeopardized by the prosecutors' continuing to prosecute the case.

■ A district court has broad discretion in determining whether to disqualify a district attorney's office. *People v. C. V.,* 64 P.3d 272, 274 (Colo.2003); *People v. Palomo,* 31 P.3d 879, 882 (Colo.2001). We therefore review such a decision for an abuse of discretion. *Dunlap v. People,* 173 P.3d 1054, 1094 (Colo.2007). A court abuses this broad discretion only if its decision is manifestly arbitrary, unreasonable, or unfair. *Id.; Palomo,* 31 P.3d at 882.

■ Section 20–1–107, C.R.S.2008, creates an exception to the general rule that district attorneys must prosecute criminal cases, and allows the court to appoint a special prosecutor in limited circumstances. *See People v. Lincoln,* 161 P.3d 1274, 1278 (Colo.2007). "[T]he statute authorizes disqualification only 'when the district attorney has an interest in the litigation apart from his professional responsibility of upholding the law.'" *Id.* at 1279 (quoting in part *People in Interest of N.R.,* 139 P.3d 671, 676 (Colo.2006)). Subsection (2) of the statute provides, in relevant part, that "[a] district attorney may only be disqualified ... upon a showing that the district attorney has a personal or financial interest or [if the court] finds special circumstances that would render it unlikely that the defendant would receive a fair trial."

■ Here, the prosecutors did not have a personal or financial interest. This inquiry focuses on "'whether the members of the district attorney's office would stand to receive personal benefit or detriment from the outcome of a case.'" *N.R.,* 139 P.3d at 676 (quoting *Palomo,* 31 P.3d at 882); *accord C.V.,* 64 P.3d at 275. Defendant's conviction would not personally benefit the prosecutors: whether defendant was convicted or not would have no bearing on whether the prosecutors could be held criminally or civilly liable for any alleged violation of the federal statute. Though defendant alleged that the prosecutors would benefit personally if he received the death penalty, the People did

not seek the death penalty in defendant's second trial. And, in any event, any investigation and prosecution of the prosecutors for violating the confidentiality statute would not depend on defendant's testimony under the facts in this case.

We also reject defendant's contention that the prosecutors' actions created a disqualifying appearance of impropriety. The supreme court has held that the 2002 amendments to section 20–1–107 eliminated appearance of impropriety as a basis for disqualification. *Dunlap*, 173 P.3d at 1094; *Lincoln*, 161 P.3d at 1279; *N.R.*, 139 P.3d at 674–75.

 Finally, we reject defendant's contention that the prosecutors had a disqualifying "conflict of interest." This contention is cognizable under the "special circumstances" clause of section 20–1–107(2). *See Dunlap*, 173 P.3d at 1094. In determining whether special circumstances warranting disqualification exist, the court must focus on whether the defendant will receive a fair trial. *Id.; Lincoln*, 161 P.3d at 1279. Defendant's allegation of a conflict of interest is premised on his allegation that the prosecutors must "defend themselves" against his contention that they broke the law by violating the federal statute. Accusing a prosecutor of wrongdoing, however, does not automatically create a conflict of interest. *See Dunlap*, 173 P.3d at 1093–95 (the defendant's allegation that the prosecutors committed theft of his medical records did not justify disqualification); *Palomo*, 31 P.3d at 882–85 (same). As in *Dunlap* and *Palomo*, which involved allegations against prosecutors similar to those in this case, we perceive nothing in the record indicating that defendant could not receive a fair trial.

Accordingly, we conclude that the district court did not abuse its discretion in denying defendant's motion to disqualify the prosecutors.

## IV. Motions to Suppress

Defendant contends the district court erred in denying his motions to suppress statements he made to investigators on September 9 and 10, 2000 after he waived his *Miranda* rights. More specifically, he argues that (1) any statements he made after he allegedly invoked his right to remain silent on the afternoon of September 9 should have been suppressed because the investigators failed to scrupulously honor his request to terminate questioning; and (2) any statements he made after he requested an attorney later in the evening of September 9 should have been suppressed because he did not subsequently initiate conversations with the investigators and he did not receive another *Miranda* advisement before questioning resumed. We reject each of these contentions.

### A. Facts

After defendant was placed in custody, he was taken to the Teller County Sheriff's Office and put in an interview room at about 5:45 a.m. on September 9. Defendant slept there for several hours.

At about 10:35 a.m., a sheriff's office sergeant and a district attorney's office investigator came into the interview room. They gave defendant a written *Miranda* waiver form. Defendant read the form and signed it.

Over the next several hours, the sergeant and the investigator questioned defendant, primarily about his "visions." The tone of their questioning was, for the most part, low key and friendly. Defendant's mood, however, changed several times, from calm to upset and back again to calm. The interrogators provided defendant with food, drink, cigarettes, and his medication, and allowed him to take bathroom breaks.

Defendant told the investigators he wanted to show them a campsite where clues to the murder he saw in his visions could be found. Defendant directed them to the campsite where he had camped with Easton and the others. They returned to the sheriff's office at about 4:30 p.m. During that trip, defendant continued to talk about his visions.

Upon returning to the sheriff's office, defendant saw his wife and, after he had been returned to the interrogation room, asked the investigators if he could talk to her. The investigators left the room for several min-

utes. While they were out of the room, but monitoring defendant by video camera, defendant said, "I ain't helping you no more till I see my wife.... Doing nothing else, saying nothing else till I see my wife."

The investigators returned to the room a few minutes later. They told defendant they had talked to his wife and she wanted them to tell him that she loved him and that their children were fine. Defendant, crying, then said, "Fuck that, I want to see my wife before I help anymore, I want to see her. I won't say nothing, I won't talk to nobody until I see my wife. That's all I want is to see my wife." One of the investigators told defendant his wife had gone to get something to eat and would be back soon. Defendant said he "didn't wanna know no more, I don't wanna hear no more, see no more, I don't wanna hear it, I don't. I can't handle this man." The investigators continued to question defendant.

At about 6:00 p.m., the investigators allowed defendant to talk to his wife. They formally arrested defendant at 6:35 p.m. and once again advised him of his rights. Defendant indicated he wanted a lawyer. The investigators ceased their questioning and took defendant to the jail for booking.

Later, sheriff's deputies took defendant to a hospital to obtain physical samples from him. During the ride to the hospital, defendant asked the deputies if they had a tape recorder and told them he wanted to make a statement. For the first time, defendant admitted that he had been at the campsite with Easton and the victim, and said the victim had come to the campsite with them willingly (which contradicted his earlier "visions" of a kidnapping). He did not say that anyone else was at the campsite. After the biological samples had been taken, the deputies returned defendant to the jail at about midnight.

The next morning, at about 10:30 a.m., defendant asked jail personnel to arrange for him to speak again with the sergeant and the investigator. At the sheriff's office, the sergeant once again advised defendant of his rights, defendant waived his rights, and the sergeant and the investigator then questioned defendant for about two hours.

## B. The District Court's Ruling

The district court held several hearings on defendant's motions to suppress. Numerous witnesses testified and video and audio tapes of the interrogations on September 9 and 10 were introduced into evidence.

As to defendant's statements that he wanted to see his wife, the district court found that the statements were not unequivocal requests to terminate questioning. The court found defendant was concerned primarily with seeing his wife rather than terminating questioning; that he seemed to be saying that if he could see his wife he would continue. Therefore, the court ruled that a reasonable police officer would not construe those statements as requests to end the interview, and therefore the sergeant and the investigator were not obligated to clarify defendant's intent or terminate the interview.

As to the questioning after defendant asked for an attorney, the district court found that both on the trip to the hospital and the following morning in jail defendant had initiated further questioning out of a desire to tell law enforcement officers about the case. Under those circumstances, law enforcement officers could properly question defendant.

## C. Standard of Review

■■■■ "When reviewing a district court's suppression ruling, we defer to the court's findings of fact but review its conclusions of law de novo." *People v. Muniz*, 190 P.3d 774, 783 (Colo.App.2008) (citing *People v. Allen*, 199 P.3d 33, 35 (Colo.App. 2007)). Defendant contends that the district court misapplied the law to the facts. Therefore, we review the district court's ultimate conclusions de novo. *See People v. Boykins*, 140 P.3d 87, 91 (Colo.App.2005) (appellate court reviews de novo whether district court's conclusions are supported by sufficient evidence and whether the court applied the correct legal standard (citing *People v. Syrie*, 101 P.3d 219 (Colo.2004))). We consider the district court's rulings under the totality of the circumstances. *Syrie*, 101 P.3d at 222.

## D. Right to Remain Silent

■ "By invoking ... the right to remain silent, a suspect may at any time before or during custodial interrogation cut off the questioning.... Once a criminal suspect invokes his right to remain silent, the police must 'scrupulously honor' the assertion of this right in order to comply with the *Miranda* doctrine." *People v. Arroya,* 988 P.2d 1124, 1130 (Colo.1999); *see Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

■ A suspect seeking to invoke his right to remain silent must clearly articulate his desire to do so; the assertion of the right must be such that "a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect is asserting [his] *Miranda* right to cut off questioning...." *Arroya,* 988 P.2d at 1130; *accord Muniz,* 190 P.3d at 783. The suspect need not use "special or ritualistic phrases," and "a court must give 'a broad, rather than a narrow, interpretation' to requests to cut off questioning." *Arroya,* 988 P.2d at 1132 (quoting in part, ultimately, *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)). However, "[i]f a suspect makes an ambiguous or equivocal statement, police officers need not attempt to clarify the statement or ascertain the suspect's intent to invoke his right to remain silent, and are free to continue the questioning." *Muniz,* 190 P.3d at 783–84; *accord Davis v. United States,* 512 U.S. 452, 461–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Arroya,* 988 P.2d at 1131.

■ In determining whether a suspect has clearly articulated his desire to cut off questioning, a court should assess the context of the suspect's words and conduct under the totality of the circumstances, giving due consideration to a variety of factors, including

the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect [allegedly] invoked the right to remain silent, and who was present during the interrogation.

*Arroya,* 988 P.2d at 1132; *accord Muniz,* 190 P.3d at 784; *see People v. Romero,* 953 P.2d 550, 555–56 (Colo.1998). The court may consider other relevant factors as well, so long as it demonstrates that it has considered the totality of the circumstances. *Arroya,* 988 P.2d at 1132–33.

■ The district court here articulated the relevant legal principles and considered the totality of the circumstances. We perceive no error in its conclusion that defendant did not unambiguously invoke his right to remain silent. Defendant was eager to cooperate with the police and to speak with them. The sergeant and investigator who questioned defendant did not construe defendant's statements as requests to terminate the interview. They exhibited a calm demeanor throughout the interview. When they told defendant his wife had left to go to the store, he did not express any intent to stop the interview. Under the circumstances, a reasonable officer could have understood defendant's statements as indicating a desire to continue the interview, though his most immediate concern for a few minutes was to talk to his wife. *Cf. Muniz,* 190 P.3d at 783 (defendant's statements that "[t]o end this interview" he wanted to provide a blood sample, and that he "want[ed] to go home" were not unequivocal invocations of right to remain silent).

## E. Right to Counsel

■ Where during the course of custodial interrogation a suspect indicates he would like to speak to an attorney, all questioning must cease. *People v. Gonzales,* 987 P.2d 239, 240 (Colo.1999); *see Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 444–45, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, if, after questioning has ceased pursuant to a suspect's request for counsel, the suspect later initiates a conversation with police, and the totality of the circumstances shows an intent by the suspect to waive his right to counsel, further questioning is permitted. *Oregon v. Bradshaw,* 462 U.S. 1039, 1043–46,

103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality op.); *id.* at 1052–54 & n. 2, 103 S.Ct. 2830 (Marshall, J., dissenting); *Edwards,* 451 U.S. at 484–86 & n. 9, 101 S.Ct. 1880; *see People v. Redgebol,* 184 P.3d 86, 99 (Colo.2008); *People v. Martinez,* 789 P.2d 420, 422 (Colo. 1990). To open the door to further questioning, the suspect's statements must " 'evince[ ] a willingness and a desire for a generalized discussion about the investigation,' and not merely question the reasons for custody." *Martinez,* 789 P.2d at 422 (quoting in part *Bradshaw,* 462 U.S. at 1045–46, 103 S.Ct. 2830 (plurality op.) ); *accord Redgebol,* 184 P.3d at 99.

▪ Both when defendant accompanied deputies to the hospital and the following morning when he was in jail, he initiated conversations with police about the investigation. The trip to the hospital occurred within one or two hours of defendant's being advised, for the second time, of his right to counsel, and the sergeant and the investigator did not question defendant the following morning until they had advised him of his rights a third time. The circumstances clearly indicate that defendant was aware at all times of his right to counsel, and that he nevertheless wanted to tell the police more of what he knew without counsel representing him being present. Therefore, the district court did not err in denying defendant's motions to suppress his statements after he invoked his right to counsel.

### V. Other Evidentiary Issues

Defendant challenges certain of the district court's rulings (1) excluding evidence offered to impeach Easton, (2) admitting evidence of his prior bad acts, and (3) admitting DNA evidence. We conclude that defendant has failed to establish that the court committed any reversible error in its evidentiary rulings.

### A. Impeachment of Easton

Defendant presented a great deal of evidence at trial tending to discredit Easton, including the following:

● The mother of Easton's child testified that Easton had assaulted her, while she was holding their child. She also testified that Easton had told her he wanted to protect Olan from being charged in the murder, and she contradicted Easton's testimony as to why they were no longer seeing each other.

● Easton admitted he had been convicted of a domestic violence charge arising from the assault of his former girlfriend.

● Defendant's counsel confronted Easton with inconsistencies between his testimony in the first trial and his testimony in the second trial.

● Three inmates testified as to things Easton had told them after he had been arrested, contradicting Easton's testimony in many critical respects.

● Several witnesses testified as to Easton's reputation for untruthfulness.

In attempting to further attack Easton's credibility, defendant's counsel sought to question him about why he had gotten into trouble while he was in prison; "material falsehoods" he told the prosecution about his criminal history in his plea agreement arising out of the victim's murder; his background generally as it would have borne on the likelihood that he could have received the death penalty for his role in the victim's murder; and prior incidents of sexual misconduct. The court sustained the prosecution's objections to this evidence, largely based on lack of relevance and the concerns articulated in CRE 403.

▪ The district court has considerable discretion in determining the permissible scope of cross-examination, and absent a showing of an abuse of that discretion, we will not disturb its rulings. *People v. Rodriguez,* 914 P.2d 230, 267 (Colo.1996); *Vega v. People,* 893 P.2d 107, 118 (Colo.1995). While it is constitutional error to limit excessively a defendant's cross-examination of a witness as to the witness's credibility, especially his bias, prejudice, or motive for testifying, the court's broad discretion allows for placing reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, repetition, and relevance. *Vega,* 893 P.2d at 118; *Merritt v. People,* 842 P.2d 162,

166, 167 (Colo.1992); *People v. Huehn*, 53 P.3d 733, 739 (Colo.App.2002).

With these principles in mind, we address, and reject, each of defendant's contentions in turn.

### 1. Prison Incident

Easton testified that he was afraid he might be killed for testifying against defendant because he would be branded a "snitch," and therefore he "got in trouble" in prison so that he would be placed in solitary confinement.

On cross-examination, defendant's counsel sought to impeach Easton with evidence that the "trouble" to which he had referred was that he had possessed alcohol, gotten drunk, and assaulted a prison guard, and that a felony charge of assault had been dismissed as part of a plea agreement. Counsel represented that Easton had said during his prison disciplinary hearing that he had gotten drunk because he had not received pictures and letters from his daughter (who had just had her birthday), not because he wanted to be transferred to a more secure location.

The prosecutor objected that although evidence of the plea agreement was relevant, evidence of the events out of which the charges arose was not. The court sustained the prosecutor's objection, ruling that the desired line of questioning would lead to a "waste of time" and he did not want counsel "to get into uncharged bad acts."

█ On appeal, defendant argues the excluded evidence of Easton's previously stated reason for getting in trouble and the dismissal of the assault charge was relevant to show motive and bias and to impeach him. In the district court, however, defendant's counsel did not assert motive or bias, but rather, limited the relevance argument to impeachment, that is, that the evidence contradicted Easton's testimony and for that reason bore on his credibility. Therefore, we consider only whether the court erred in excluding the evidence as impeachment. *See Harrison v. Smith*, 821 P.2d 832, 834 (Colo.App.1991).

█ Assuming the accuracy of counsel's offer of proof, we conclude evidence that Easton previously gave a different reason for the prison incident than that which he gave at trial would have impeachment value. Evidence of the assault charge and the subsequent dismissal of that charge would not, however, because the fact of such a charge did not contradict his trial testimony.

Weighed against this impeachment value are considerations that admitting the impeachment evidence would have gone to a matter not central to this case or involving the events at issue in this case and would have risked bogging the trial down in the details of the prison incident, and that a great deal of other evidence was introduced that impeached Easton. Therefore, we cannot say that the district court abused its discretion in precluding the evidence on the basis of waste of time. *See* CRE 403.

### 2. Omissions from Plea Agreement Form

Defendant was permitted to introduce Easton's plea agreement into evidence. However, defendant's counsel sought to question Easton about prior non-felony convictions and charges that he had not disclosed in the plea agreement, an alleged violation of its terms. The convictions and charges allegedly involved assaults, an escape, a drug conviction, and a contempt of court conviction. The prosecution objected that the misdemeanor convictions and charges were prior instances of conduct that defendant was attempting to use to establish Easton's character for untruthfulness in violation of CRE 608(b). The court sustained the objection, ruling that while such evidence could be admitted under Rule 608(b) if genuinely probative of Easton's character for untruthfulness, the potential probative value of the evidence at issue was "small" and opening the door to inquiry into these prior instances of conduct presented a "great possibility of leading into undue delay, waste of time and needless presentation."

Defendant now contends the excluded evidence showed that Easton believed he could lie with impunity because the prosecution did not care whether he accurately described his entire criminal history in the plea agreement. Defendant's counsel did not articulate this theory of admissibility in the district court.

Indeed, beyond saying that he had been permitted to introduce the evidence in defendant's first trial, he did not clearly articulate any theory of admissibility.

■ Even were we to determine that defendant preserved this issue, we would conclude that the district court did not abuse its discretion. Rule 608(b) provides that specific instances of conduct to establish a witness's character for untruthfulness may not be proved by extrinsic evidence. The rule provides an exception for evidence of convictions of crimes as provided in section 13–90–101, C.R.S.2008; however, that statute limits evidence of convictions to attack a witness's credibility to felony convictions.

The excluded evidence at issue here, as noted, was of misdemeanor convictions and charges that did not even result in convictions. Clearly, defendant was attempting to establish Easton's character for untruthfulness by specific instances of conduct. The record supports the district court's determination that the instances were not intrinsically probative of Easton's character for untruthfulness, and were therefore inadmissible under Rule 608(b). *See People v. Knight,* 167 P.3d 147, 153 (Colo.App.2006); *cf. People v. Jones,* 971 P.2d 243, 244–45 (Colo.App. 1998) (misdemeanor conviction for theft was not probative of character for untruthfulness).

Though defendant's counsel could have asked Easton whether he had failed to note all prior convictions and charges in the plea agreement, and thereby made the point that Easton had been less than forthcoming in the plea agreement, that is not what counsel sought to do. Rather, counsel sought to ask Easton about the nature of the omitted convictions and charges, and to delve into the factual bases therefor. As discussed above, that tactic was not consistent with Rule 608(b).

### 3. Motive to Avoid the Death Penalty

■ By pleading guilty to second degree murder and second degree kidnapping, Easton avoided a potential sentence of death. Defendant's counsel was permitted to bring out that fact; however, defendant's counsel sought to cross-examine Easton on a number of alleged incidents from Easton's past and to present extensive evidence of Easton's bad character to show, apparently, that he had genuine reason to anticipate imposition of the death penalty. The court refused to allow this evidence.

On appeal, defendant argues that because Easton's "entire character, background and history would have been admissible in support of a death sentence," it should have been admissible in this case on the theory that Easton's "motive to fabricate a story increases in direct relation to the aggravated nature of his background and history." We are not persuaded.

To permit the evidence defendant sought to present would have turned defendant's trial into the equivalent of the death penalty trial Easton avoided by pleading guilty. Undue delay, waste of time, and confusion of the issues would have been unavoidable. Moreover, a side-show about how likely it was that Easton would have been sentenced to death would have been inherently speculative. In sum, no proper purpose would have been served by permitting such a far-reaching and potentially unmanageable inquiry. Accordingly, the district court did not abuse its discretion in precluding this evidence.

### 4. Prior Sexual Conduct

■ Defendant sought to introduce evidence of Easton's alleged sexual assaults and manipulations of young victims, all allegedly occurring while he was a juvenile, arguing that such evidence contradicted his testimony that it was defendant's idea to kidnap a girl for sexual purposes. The prosecution objected on a variety of grounds, including that the rape shield statute, section 18–3–407, C.R.S. 2008, barred such evidence; the evidence was irrelevant; and CRE 404(b) barred the evidence. The court sustained those objections, ruling that there was "no material or relevant use for the evidence, which could only be used for the improper purpose of suggesting that Easton acted in conformity with prior bad acts."

The court's ruling is manifestly correct. At bottom, defendant sought to demonstrate by particular instances of conduct that Ea-

ston was a bad person who acted in this case as he had acted before. We are not persuaded by defendant's attempt to characterize the evidence as going to credibility. To the extent it might have done so, it would not have done so in any legitimate manner sanctioned by the rules of evidence. *See People v. Manners,* 713 P.2d 1348, 1351–52 (Colo.App.1985).

## B. Evidence of Other Bad Acts of Defendant

Defendant contends the district court reversibly erred in admitting evidence of his allegedly irrelevant prior bad acts and character, specifically: (1) Easton's testimony that he, Easton, and (on a couple of occasions) others stole items from stores, returned the items for cash, and purchased alcohol and marijuana during the camping trip; (2) his own statements to the investigators that he had used cocaine in the past and was "detoxing" during the camping trip; (3) his own statement to the investigators that his wife thought he was a "royal asshole" when he smoked marijuana; and (4) his own statement to investigators that when he spent time with Easton "it's usually to smoke a joint or something." The People concede that defendant timely objected to all this evidence. The court admitted the evidence of the store thefts as res gestae, and the other evidence on the grounds it was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice.

■■■ We review a district court's evidentiary rulings, including those regarding the admissibility of res gestae evidence and prior acts evidence, for an abuse of discretion. *People v. Ibarra,* 849 P.2d 33, 38 (Colo. 1993); *People v. Raglin,* 21 P.3d 419, 424 (Colo.App.2000); *People v. Young,* 987 P.2d 889, 893 (Colo.App.1999). We also accord the district court considerable discretion in determining the relevancy of evidence, its probative value, and its potentially prejudicial impact. *Ibarra,* 849 P.2d at 38. A district court abuses its discretion in making these rulings and determinations only where they are manifestly arbitrary, unreasonable, or unfair. *Id.; People v. White,* 55 P.3d 220, 223 (Colo.App.2002).

### 1. Thefts

As noted, Easton testified that on three occasions before he and defendant picked up the victim and on one occasion after the murder, he and defendant went to stores where defendant stole items, Easton returned the items for cash, and they used the proceeds to buy alcohol, marijuana, cigarettes, and "supplies." Easton's testimony about these incidents was interspersed within his lengthy testimony about the events leading up to and following the murder.

■■■ "Evidence of other offenses or acts that is not extrinsic to the offense charged, but rather, is part of the criminal episode or transaction with which the defendant is charged, is admissible to provide the factfinder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred." *People v. Quintana,* 882 P.2d 1366, 1373 (Colo.1994). Such evidence, considered part of the res gestae of the offense, " 'forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.' " *Id.* (quoting *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir.1985)).

■■■ Res gestae evidence is not subject to the general rule that evidence of prior criminality should be excluded, and it need not meet the requirements of evidence sought to be introduced pursuant to CRE 404(b). *Id.* at 1373 & n. 12; *Young,* 987 P.2d at 893. Instead, to be admissible, res gestae evidence must be relevant, and its probative value must not be substantially outweighed by the danger of unfair prejudice. *People v. Rollins,* 892 P.2d 866, 873 (Colo.1995).

■■■ The evidence at issue here was relevant for at least two reasons. First, it helped demonstrate the nature and extent of the relationship between defendant and Easton, including the degree to which they trusted one another. This bore directly on issues of credibility, particularly since defendant attempted to distance himself from Easton as much as possible in his statements to police and in presenting a defense at trial.

Second, the evidence was part of the story involving Olan, whom defendant contended was the second participant in the alleged sexual assaults and murder (along with Easton). Olan was allegedly involved in two of the earlier store thefts and the cabin burglary. In the course of the investigation of the victim's murder, Olan lied to investigators about having been camping with defendant and Easton, a lie about which defendant's counsel cross-examined him in an effort to implicate him in the sexual assaults and the victim's murder. Evidence of the thefts and burglary therefore showed that Olan had a motive to lie to the investigators apart from any alleged involvement in the sexual assaults and murder.

■■■ We conclude that the district court did not abuse its discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Cf. People v. Lucas, 992 P.2d 619, 624 (Colo.App.1999) (evidence of burglary committed three days before the charged murder was properly admitted as res gestae because it explained the setting in which the homicide occurred); Young, 987 P.2d at 893–94 (evidence that the defendant bought marijuana which he and the victim intended to sell was properly admitted as res gestae of the alleged murder because it explained why the defendant and the victim were traveling together and why they may have had a falling out that ended violently). We also observe that the court twice gave the jury appropriate limiting instructions before Easton's testimony about the thefts and again gave the jury a limiting instruction prior to its deliberations, thereby reducing the prospect of any unfair prejudice. People v. Dunlap, 975 P.2d 723, 743 (Colo.1999) (absent evidence to the contrary, appellate court must presume that a jury followed the court's instructions).

## 2. Other Acts

The other evidence of prior acts which defendant challenges on appeal consists of statements he made to investigators on September 9 and 10. Edited tapes of the interviews were introduced into evidence.

■■ Though we perceive no abuse of discretion in the court's decisions allowing those statements into evidence, we need not expound on the standards for admissibility of evidence under CRE 404(b) and the admissibility of the particular statements in light of those standards because we conclude that any error in admitting them was harmless.

The statements did not directly implicate defendant in the charged offenses. Each of the statements at issue was brief, and together they comprised a tiny portion of the evidence presented in a trial that lasted several weeks. The only one the prosecutor mentioned in closing argument was defendant's statement that he went camping to "detox." Further, other evidence of defendant's marijuana use was presented to the jury. Under the circumstances, these brief, isolated statements, even if erroneously admitted, did not affect defendant's substantial rights. See Crim. P. 52(a); People v. Blecha, 940 P.2d 1070, 1074–75 (Colo.App.1996), aff'd, 962 P.2d 931 (Colo.1998).

## C. DNA Evidence

The prosecution designated an expert witness, Dr. Dressel, an employee of the Colorado Bureau of Investigation, to testify concerning results of DNA tests, which, among other things, effectively linked both the victim and defendant to DNA samples taken from defendant's shorts and a sleeping bag. Defendant objected to the admissibility of Dr. Dressel's testimony on a variety of grounds by means of motions in limine, and requested a Shreck hearing to resolve those objections. See People v. Shreck, 22 P.3d 68 (Colo.2001). Following a number of hearings, the court ruled that the testimony was admissible.

As relevant here, Dr. Dressel testified at trial that based on tests of scrapings taken from under the victim's fingernails and of samples obtained from the victim's parents, the scrapings belonged to the victim to a "reasonable degree of scientific certainty." These tests were performed to determine a standard DNA profile from the victim, which could then be used to assess whether the victim's DNA was on several items of physical evidence, including the shorts and sleep-

ing bag. Dr. Dressel opined that the victim could not be excluded as the source of DNA found on the shorts and sleeping bag, though 99.9% and 99.8% of the public, respectively, could be. Dr. Dressel similarly testified that defendant also could not be excluded as the source of other DNA also found on the shorts and sleeping bag.

The prosecutor argued to the jury that the DNA evidence was probative primarily to show that defendant sexually assaulted the victim, but at one point the prosecutor appeared to argue that the evidence was corroborative of the murder charge as well. As noted, the jury acquitted defendant of the sexual assault charges.

On appeal, defendant contends the district court erred in allowing Dr. Dressel's testimony about the victim's DNA profile because (1) Dr. Dressel did not conduct a statistical analysis of the precise likelihood that the scrapings belonged to the victim; (2) Dr. Dressel was not qualified to render her opinion concerning the origin of the scrapings; and (3) the district court failed to make detailed findings supporting its ruling as required by *Shreck*. Defendant does not contest the admissibility of any of the DNA evidence connecting defendant and Easton to various items of physical evidence.

■■■■■ "[T]he standard of review pertaining to the admissibility of expert testimony is highly deferential. Trial courts are vested with broad discretion to determine the admissibility of expert testimony, and the exercise of that discretion will not be overturned unless manifestly erroneous." *People v. Ramirez*, 155 P.3d 371, 380 (Colo.2007); *accord Golob v. People*, 180 P.3d 1006, 1011 (Colo.2008). Such deference is warranted because the district court has a superior opportunity to assess the expert's competence and the extent to which the expert's opinion would be helpful to the fact finder. *Golob*, 180 P.3d at 1011; *Ramirez*, 155 P.3d at 380.

The Colorado Rules of Evidence, including primarily CRE 702 and 403, govern the admissibility of expert testimony. *Ramirez*, 155 P.3d at 378; *Shreck*, 22 P.3d at 77. CRE 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■■■■■ Scientific testimony is admissible under CRE 702 if it is both reliable and relevant. "To determine reliability, the court considers whether the scientific principles underlying the testimony are reasonably reliable, and whether the expert is qualified to opine on such matters." *Ramirez*, 155 P.3d at 378; *accord Shreck*, 22 P.3d at 77. This reliability inquiry should be broad in nature, encompassing the totality of all relevant circumstances. *Golob*, 180 P.3d at 1011; *Ramirez*, 155 P.3d at 378; *Shreck*, 22 P.3d at 77.

■■■■■ "In determining whether evidence is relevant, a trial court should consider whether the testimony would be useful to the jury." *Shreck*, 22 P.3d at 77; *accord Ramirez*, 155 P.3d at 379. "Usefulness thus hinges on whether there is a logical relation between the proffered testimony and the factual issues involved in the case." *Ramirez*, 155 P.3d at 379; *see* CRE 402.

■■■■■ If the court determines that the testimony is admissible under CRE 702, it should consider whether the testimony should be excluded for the reasons articulated in CRE 403—that is, where the probative value of the testimony is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See Ramirez*, 155 P.3d at 379; *Shreck*, 22 P.3d at 78. "Essentially, evidence should be excluded when it has an undue tendency to suggest a decision on an improper basis." *Ramirez*, 155 P.3d at 379.

■■■■ In reviewing the district court's decision admitting the expert testimony, we are mindful that the rules of evidence reflect a liberal approach to the admissibility of expert testimony. *See Golob*, 180 P.3d at 1011; *Shreck*, 22 P.3d at 77–78. "Any concerns that invalid scientific assertions will be ad-

mitted under this liberal standard are assuaged by Rule 702's overarching mandate of reliability and relevance.... Such concerns are also mitigated by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Shreck,* 22 P.3d at 78 (quoting in part *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); first citation to *Daubert* omitted).

■ Defendant contends initially that a statistical analysis calculating the probability of a random match between the DNA profile derived from an individual and one derived from other physical evidence is required before any DNA evidence may be admitted. In support of that contention, defendant relies on *Fishback v. People,* 851 P.2d 884 (Colo. 1993). In *Fishback,* however, the issue was evidence of a "match" between the defendant's DNA and DNA found at the crime scene. In a footnote, the court indicated that evidence of such a match is meaningless without testimony of its statistical significance. *Id.* at 893 & n. 18.

In this case, however, the DNA evidence linking the scrapings under the victim's fingernails to the victim was not, strictly speaking, "match" evidence. Rather, the method of analysis employed showed that the victim *could not be excluded* as the source of the DNA under her fingernails. Dr. Dressel testified that this method of analysis was generally accepted and, because of various points of commonality, corroborated to "a reasonable degree of scientific certainty" the high likelihood (again, generally accepted in the scientific community) that tissue scrapings found under an individual's fingernails will belong to that individual. Dr. Dressel further testified that while a statistical analysis of such "cannot exclude" evidence could be performed, it is not essential to establishing the scientific reliability of the evidence. The district court credited Dr. Dressel's testimony in this regard, and the record does not support the conclusion that the court acted in a manifestly arbitrary, unreasonable, or unfair way in doing so.

Defendant's contention that Dr. Dressel was not qualified to render an opinion on the victim's DNA is premised on his assertion that she was not qualified to perform a particular type of statistical analysis. However, because we have concluded that a statistical analysis was not required to render the evidence at issue admissible, this contention fails.

Based on our review of the record, we conclude that the court did not abuse its discretion in finding that the DNA evidence regarding the scrapings from under the victim's fingernails was sufficiently reliable to be admissible. As defendant does not contend that the evidence was irrelevant or that its probative value was substantially outweighed by any of the concerns expressed in CRE 403, we also conclude that the district court did not abuse its discretion in denying defendant's motions to exclude the evidence. *Cf. People v. Laurent,* 194 P.3d 1053, 1059 (Colo.App. 2008) (court did not abuse its discretion in admitting testimony of expert in forensic chemistry even though expert's testing was not done in accordance with a written, validated analytical method); *People v. Rojas,* 181 P.3d 1216, 1221–22 (Colo.App. 2008) (court did not err in admitting DNA "mixture" evidence even though expert could not say that the victim definitely could be included among the possible contributors to the mixture).

Finally, we reject defendant's contention that the district court did not make sufficient findings on the record to justify allowing the evidence to be admitted. The district court, following numerous hearings in which it participated actively, found that Dr. Dressel's procedures were "correct and reliable," that she was qualified, and that "her science was reliable." The court found that the evidence "passes muster from [sic] rule 702," that it was reliable and relevant, and that its probative value "far outweighs" its potentially prejudicial effect.

Though the district court could have made more specific findings, we note that defendant did not request more specific findings or object to the generality of the court's findings. Therefore, we review defendant's challenge to the sufficiency of the court's findings for plain error. In light of our conclusion that the evidence was admissible, we also

conclude that any error in the degree of detail of the district court's findings did not prejudice defendant, and therefore any such error does not cast doubt on the reliability of the district court's decision.

## VI. Jury Instructions

Defendant claims three errors with respect to the instructions tendered to the jury: (1) the verdict form for the first degree murder charge did not have a line for the foreperson to sign indicating a not guilty verdict on the lesser included offense of second degree murder; (2) the evidence presented at trial did not support instructing the jury on the lesser included offense of second degree murder; and (3) the court should not have instructed the jury on the complicity theory of criminal liability because complicity was not expressly charged in the information. We conclude that while the verdict form for the homicide charge erroneously omitted a signature line, there is no reasonable probability that the omission contributed to the guilty verdict. We perceive no error with respect to the giving of an instruction on second degree murder or on the complicity theory.

## A. Verdict Form

■ Defendant contends that the absence on the verdict form for the murder charge of a space for the jury to indicate that it found him not guilty of second degree murder requires reversal of his conviction for second degree murder. We agree that the verdict form was incomplete, but conclude that reversal is not required.

The verdict form contained a line for the signature of the foreperson if the jury found defendant not guilty of first degree murder. It also contained spaces for the foreperson to mark an "X" if the jury found defendant guilty of first degree murder or second degree murder, and a signature line for the foreperson confirming such a verdict. However, the form omitted any separate signature line for the foreperson to indicate that the jury had found defendant not guilty of second degree murder. We will assume for purposes of addressing defendant's contention that this omission was error.

■ Defendant did not timely object to the omission in the verdict form at trial. *See* Crim. P. 30 (only objections to instructions made before they are given to the jury are preserved for review). Ordinarily, a defendant's failure to object timely in the district court to an instructional error, including an error in a verdict form, renders the contention of error on appeal subject to plain error review. *Griego v. People*, 19 P.3d 1, 8 (Colo. 2001); *People v. Dunlap*, 124 P.3d 780, 793 (Colo.App.2004); *People v. Kyle*, 111 P.3d 491, 500 (Colo.App.2004); *see People v. Ramirez*, 56 P.3d 89, 93 (Colo.2002). Defendant argues, however, that the omission here constituted a "structural error"—that is, one which requires automatic reversal.

■ Structural errors are those errors which affect the framework within which the trial proceeds rather than merely the trial process itself. They are so intrinsically harmful, and infect the entire trial process in such a way, that they deprive a defendant of the basic protections without which a criminal trial cannot reliably serve its function of deciding guilt. *Neder v. United States*, 527 U.S. 1, 7–9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *see Dunlap*, 975 P.2d at 737 (the nature of a structural error is that its effect is "necessarily unquantifiable and indeterminate"); *Bogdanov v. People*, 941 P.2d 247, 252 (Colo.) (same), *amended*, 955 P.2d 997 (Colo.1997). If an error is structural, it is not susceptible of harmless error or plain error review. *Dunlap*, 975 P.2d at 736–37; *Bogdanov*, 941 P.2d at 253; *but see Johnson v. United States*, 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (indicating that even structural errors are subject to plain error review).

Both the United States Supreme Court and the Colorado Supreme Court have held that an instructional error omitting a material element of an offense is not a structural error. *Neder*, 527 U.S. at 8–15, 119 S.Ct. 1827 (applying harmless error analysis); *Griego*, 19 P.3d at 7–8; *see Johnson*, 520 U.S. at 463, 117 S.Ct. 1544 (applying plain error review to the omission of an element of a charge where the defendant failed to object contemporaneously). This is because such

an error "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder,* 527 U.S. at 9, 119 S.Ct. 1827 (emphasis in original).

Though the error here is somewhat different from that at issue in those decisions, we do not view that difference to be of such a quality as to call for a different conclusion here. That is because, as discussed below, the effect of the error can be assessed.

 Therefore, we review defendant's contention for plain error. Plain error is error that is both obvious and substantial, and which so undermines the fundamental fairness of the trial as to cast doubt on the reliability of the judgment of conviction. *People v. Miller,* 113 P.3d 743, 750 (Colo. 2005).

 Though defendant asserts that the jury could only have believed its choices were to find him not guilty of first degree murder or guilty of either first degree or second degree murder, the jury instructions considered as a whole, clearly informed the jury that it could find him not guilty of second degree murder.

- Instruction No. 6 accurately instructed the jury as to the prosecution's burden of proof, the presumption of innocence, and the meaning of reasonable doubt. It also told the jury, "If you find from the evidence or lack of evidence that the Prosecution has failed to prove any one or more of the elements of *any* charge beyond a reasonable doubt you will find the defendant not guilty as to that charge." (Emphasis added.)
- Instruction No. 19, defendant's theory of the case instruction, articulated defendant's position that he was not responsible at all for the victim's death.
- Instruction No. 22 told the jury that if it found defendant not guilty of first degree murder it should consider whether he was guilty of second degree murder. It stated that defendant could be found guilty of second degree murder "*if* the evidence is sufficient to establish his guilt of the lesser offense beyond a reasonable doubt." (Emphasis added.) It then reit-

erated the prosecution's burden of proof as to the lesser offense and, like Instruction No. 6, told the jury it must find defendant not guilty of second degree murder if it found the prosecution had failed to prove any element of the offense beyond a reasonable doubt.

- Instruction No. 35 told the jury it must consider each charge separately, and that it could find defendant "guilty or not guilty of any one or all of the offenses charged."
- The verdict form itself included the following two statements:

 * The foreperson should sign only one of the above (I. or II.). If the verdict is NOT GUILTY, then I. above should be signed. If the verdict is GUILTY then II. above should be signed.

 ** If you find the defendant guilty of the crime charged or one of the lesser included offenses the foreman must complete the GUILTY verdict by placing, in ink, an "X" in the appropriate square. ONLY ONE SQUARE may be filled in, with the remainder to remain unmarked.

 We presume that the jury followed the court's instructions, *Quintano v. People,* 105 P.3d 585, 594 (Colo.2005); *Dunlap,* 975 P.2d at 743; *People v. Palmer,* 189 Colo. 358, 360, 540 P.2d 341, 342 (1975), and therefore held the prosecution to its burden of proof on the second degree murder charge. This is not a case, unlike those relied on by defendant, where the court failed to inform the jury of its option to acquit the defendant. *Cf. State v. Braley,* 224 Or. 1, 355 P.2d 467, 475–76 (1960) (error in not submitting to the jury a not guilty form did not seriously affect the defendant's rights where the jury was instructed that it could find the defendant not guilty); *State v. Pelican,* 160 Vt. 536, 632 A.2d 24, 26–27 (1993) (court's instruction to the jury to convict if the jury rejected the theory of self-defense did not prejudice the defendant where the court also instructed the jury that it must acquit if it had a reasonable doubt that the defendant was guilty).

We also observe that the court polled the jurors after they returned their verdicts, and all of them affirmatively indicated that they

had found defendant guilty of second degree murder. Thus, we need not guess whether the jury's verdict accurately reflected its collective conclusion concerning defendant's guilt or innocence of second degree murder.

In light of the instructions given to the jury and the jurors' responses when polled, we conclude that the error does not cast doubt on the reliability of the judgment of conviction.

### B. Propriety of Instructing the Jury on Second Degree Murder

■ The court instructed the jury on the lesser included offense of second degree murder at the prosecution's request, to which defendant objected on the basis the evidence could not support a guilty verdict on that charge. On appeal, defendant contends the district court erred in allowing the second degree murder charge to go to the jury because (1) the prosecutor admitted during closing argument that the evidence established first degree murder, not second degree murder; and (2) on the evidence, there was no rational basis for the jury to acquit him of first degree murder but find him guilty of second degree murder. We are not persuaded by either of these contentions.

■ We review a district court's decision to instruct the jury on a lesser included offense for an abuse of discretion. See United States v. Gordon, 510 F.3d 811, 817 (8th Cir.2007), cert. denied, —— U.S. ——, 128 S.Ct. 2519, 171 L.Ed.2d 801 (2008); United States v. Arnt, 474 F.3d 1159, 1163 (9th Cir.2007) (whether the record contains sufficient evidence to support a lesser offense is a factual inquiry reviewed on appeal for an abuse of discretion).

■ The court may properly instruct the jury on a lesser offense at the prosecution's request, and over the defendant's objection, where the lesser offense is "easily ascertainable from the charging instrument" and is "not so remote in degree from the offense charged that the prosecution's request appears to be an attempt to salvage a conviction from a case which has proven to be weak...." People v. Cooke, 186 Colo. 44, 48, 525 P.2d 426, 428–29 (1974); accord People v.

Scott, 10 P.3d 686, 688 (Colo.App.2000); People v. Austin, 799 P.2d 408, 410 (Colo.App. 1990).

Here, the lesser offense of second degree murder is readily ascertainable from the charging document because it differs from the first degree murder charge only with respect to the mens rea element. Compare § 18–3–102(1)(a), C.R.S.2008 (as charged in this case, "[a] person commits the crime of murder in the first degree if ... [a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person ...."), with § 18–3–103(1), C.R.S.2008 ("A person commits the crime of murder in the second degree if the person knowingly causes the death of a person."); cf. Scott, 10 P.3d at 688–89 (where lesser offense was a lesser included offense of the charged offense and differed only in the degree of injury and the mental state, lesser offense was readily ascertainable from the information). Further, it was not so remote in degree as to appear to have been nothing more than part of an attempt to salvage a weak case. Again, it differed from the first degree murder charge only as to the mens rea element, and it represented only a one degree difference in the severity of the offense. See Scott, 10 P.3d at 689 (instruction on lesser included offense was proper even though it was an attempt to salvage a conviction where evidence supporting one element of greater offense was lacking; lesser offense was not remote in degree from the greater offense). Moreover, the evidence of first degree murder was not, in our view, weak.

■ Nonetheless, defendant argues that the evidence did not support the lesser charge of second degree murder because the evidence, if believed by the jury, established that he acted with premeditation, and that was the prosecution's only theory. We disagree.

Though the prosecutor argued in closing that the evidence supported the first degree murder charge, the prosecutor also argued in the alternative that it supported a finding beyond a reasonable doubt of second degree murder. Thus, the prosecutor did not admit that the evidence supported only first degree

murder or argue that deliberation was the only mental state supported by the evidence.

There was evidence supporting a finding of second degree, as opposed to first degree, murder. Specifically, there was evidence (a combination of Easton's testimony, defendant's statements about his "visions," and physical evidence) from which the jury could reasonably have found that defendant participated in killing the victim only after Easton threw her in the creek, and did so without having deliberated beforehand. *See* § 18–3–101(3), C.R.S.2008 (defining "after deliberation" as meaning "not only intentionally" but "after the exercise of reflection and judgment").

Therefore, the district court did not abuse its discretion in instructing the jury on the lesser included offense of second degree murder.

### C. Complicity

■ Defendant contends that allowing the jury to consider his culpability under a complicity theory violated a number of his constitutional rights, including (1) his right to due process under the United States and the Colorado Constitutions; (2) his right to be informed of the accusations against him under U.S. Const. amend. VI and Colo. Const. art. II, § 16; (3) his right to be charged only by indictment or information under Colo. Const. art. II, § 8; and (4) his right to trial by jury under U.S. const. amend. VI and Colo. Const. art. II, § 25, and as construed in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). These contentions are without merit.

The premise underlying each of defendant's arguments is that under the constitutional provisions identified above, complicity must be charged in the charging document. This premise, however, is based on a misapprehension of the nature of complicity liability.

■ Complicity is not a separate and distinct offense under Colorado's criminal code. Rather, it is a theory by which a defendant becomes accountable for a criminal offense committed by another person. *Grissom v. People,* 115 P.3d 1280, 1283 (Colo.2005); *Palmer v. People,* 964 P.2d 524, 528 (Colo. 1998); *People v. Thompson,* 655 P.2d 416, 418 (Colo.1982).

Therefore, as our supreme court has held, it is not necessary to specifically charge complicity. *Rodriguez,* 914 P.2d at 276 n. 46; *Thompson,* 655 P.2d at 417–18; *see also People v. Thurman,* 948 P.2d 69, 71 (Colo.App. 1997); *cf. State v. Gonzales,* 56 P.3d 969, 971–73 (Utah Ct.App.2002) (failure to charge accomplice liability in the charging document did not violate due process); *State v. Davis,* 963 S.W.2d 317, 326 (Mo.Ct.App.1997)(same).

The Supreme Court's decision in *Apprendi* does not cast doubt on this rule. In *Apprendi,* the Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348.

The complicity theory of liability is not a "fact that increases the penalty for a crime." Whether a defendant is convicted of an offense as a principal or a complicitor, the statutory penalty is the same. Thus, to the extent the rule of *Apprendi* implicates an obligation to charge certain facts in the charging document (a proposition for which defendant has submitted no authority), it is not applicable here. *People v. Rivas,* 77 P.3d 882, 890 (Colo.App.2003).

The judgment is affirmed.

Judge BERNARD and Judge NEY* concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2008.