PRYMAS, Appellee and Cross–Appellant,

v.

KASSAI et al., Appellants and Cross–Appellees.

[Cite as *Prymas v. Kassai,* 168 Ohio App.3d 123, 2006-Ohio-3726.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 87114, 87122 and 87178.

Decided July 20, 2006.

Powers & Groh–Wargo and Donald H. Powers, for appellee and cross-appellant.

Boyko & Dobeck and Timothy A. Boyko; Allan & Gallagher, L.L.P., and Sean P. Allan, for appellants and cross-appellees Valley Ridge, Inc., Paul M. Dowd, Emmanuel Zanoudakis and Thomas W. Kassai.

Koeth, Rice & Pelsozy Co., L.P.A., Clark D. Rice, and Ann E. Leo, for appellant and cross-appellee D.R. Hill Builders, Inc.

---

MICHAEL J. CORRIGAN, Judge.

{¶ 1} This is an appeal and cross-appeal from a jury verdict by several parties to a lawsuit over the placement of a sanitary sewer line by one property owner through land owned by another. Plaintiff William Prymas, the owner of a Marathon service station in Parma, brought claims sounding in trespass and fraud against the developer and contractor of a construction project after the developer ran a sanitary sewer line across his property without permission. A jury returned a verdict in Prymas's favor and against defendants Thomas Kassai (the project developer), Valley Ridge, Inc. (the corporation formed by Kassai to develop the property), D.R. Hill Builders, Inc. (the construction contractor), Paul Savel (a vice-president of D.R. Hill), and Paul M. Dowd and Emmanuel Zanoudakis (doctors who purchased a portion of the property lying between the service station and the project). The jury awarded Prymas $35,000 in compensatory damages and $3,000 in punitive damages. It also found that attorney fees should be awarded. The court awarded attorney fees in the amount of $140,000. The defendants challenge several evidentiary rulings, as well as the amount of damages. Prymas, for his cross-appeal, complains among other things that the court erroneously granted summary judgment to Savel and erroneously excluded evidence of his lost profits.

{¶ 2} The evidence showed that the property Valley Ridge wished to develop abutted Prymas's land. During the planning stages of the project, the routing of sanitary sewer lines became an issue. The city of Parma would not permit Valley Ridge to run sewer lines from a commercial building through a residential neighborhood in order to tie into the main. This left Valley Ridge the choice of going through Prymas's property or routing the line through the street. Most of the businesses in that area used septic systems, so Valley Ridge contacted Prymas and, in exchange for a sewer easement, offered at its own cost to remove Prymas's septic system, connect him to the sewer, and repair the grade on an existing catch basin behind one of Prymas's buildings.

{¶ 3} The jury heard conflicting evidence on whether Prymas actually agreed to Valley Ridge's terms. In any event, the city planning commission approved plans for the project, and Valley Ridge, through its contractor D.R. Hill, proceeded to install the sewer line. This process lasted two days, during which water service was suspended for area businesses, including Prymas's Marathon station, for several hours. A problem arose when D.R. Hill tried to remove the septic tank. Work crews discovered possible ground contamination from oil. Rather than remove the septic tank and risk contamination of the site, the crews bore beneath the tank and inserted the sewer line.

{¶ 4} Prymas testified that he arrived at the service station and was "shocked" to find a worker boring into his property. He claimed to have had no knowledge that the sewer line was being installed. He said that the installation of the sewer line depreciated the value of his property because Marathon Oil, which had expressed an interest in modernizing his facilities, revoked its offer to do so upon learning that the sewer line ran through the property. It is accepted building construction practice not to build over a sewer line of the kind installed on Prymas's property. Because of this, the buildable square footage of Prymas's station had been decreased so much that Marathon deemed it unfeasible to invest in rebuilding.

## I

{¶ 5} All of the defendants submitted proposed jury instructions on the affirmative defense of easement by estoppel. They argued to the court that Prymas's actions and representations had induced them into proceeding with the installation of the sewer line and that Prymas should be estopped from seeking damages for an act that he induced. The court refused to give the instruction. It reasoned that any issue relating to Prymas's permission to enter upon the property for purposes of the trespass claim would have overlapped with the issue of permission under an easement-by-estoppel defense.

## A

{¶ 6} The general rule is that the court should give a requested jury instruction if it contains a correct statement of the law applicable to the facts presented at trial and reasonable minds might reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828. The court retains the discretion, however, to consider whether the proposed instruction is either redundant or immaterial to the case. *Youssef v. Parr, Inc.* (1990), 69 Ohio App.3d 679, 690, 591 N.E.2d 762. Likewise, the court is under no obligation to give a proposed jury instruction in exactly the same language used by the offering party. *Henderson v. Spring Run Allotment*

(1994), 99 Ohio App.3d 633, 638, 651 N.E.2d 489. On appellate review, we examine the instructions as a whole to determine whether they fairly and correctly state the applicable law and not just whether the jury might have been misled. *Wozniak v. Wozniak* (1993), 90 Ohio App.3d 400, 410, 629 N.E.2d 500.

{¶ 7} The concept of estoppel in property law is said to work important functions:

{¶ 8} "First, courts often invoke the estoppel doctrine to enforce promises or representations. In these cases, reliance is important because it provides evidence of a promise, not because courts are independently concerned about reliance divorced from promise. When reliance provides strong corroboration of promise, courts enforce promises rather than limiting promises to recovery of expenditures made in reliance on the promise. On the other hand, courts sometimes invoke estoppel in tort-like settings, holding, in effect, that the relationship between the parties, or the nonverbal acts of one of the parties, creates a duty to rescue a neighbor or a tenant from dire financial consequences. This use of estoppel doctrine—to protect the interests of parties who rely on the nonverbal acts of another—is more controversial than use of estoppel doctrine to enforce express promises, but nevertheless represents a significant subcategory of estoppel cases." (Footnote omitted.) Sterk, Estoppel in Property Law (1998), 77 Neb.L.Rev. 756, 758–759.

{¶ 9} Section 2.10(1) of the Restatement of the Law 3d, Property (2000), defines the easement-by-estoppel doctrine as follows:

{¶ 10} "If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when: (1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief * * *."

{¶ 11} The Restatement view is consistent with Ohio law, which creates an easement by estoppel when:

{¶ 12} "[A]n owner of land, without objection, permits another to expend money in reliance upon a supposed easement, when in justice and equity the former ought to have disclaimed his or her conflicting rights. An easement by estoppel may also exist in a boundary strip passageway partly on each owner's premises where adjoining landowners have enjoyed reciprocal use for a long period of time. The party seeking to establish an equitable easement must show (1) a misrepresentation or fraudulent failure to speak, and (2) reasonable detrimental reliance. Courts are generally reluctant, however, to find an easement by

estoppel on the basis of passive acquiescence." *Arkes v. Gregg*, Franklin App. No. 05AP–202, 2005-Ohio-6369, 2005 WL 3220209, at ¶ 28.

{¶ 13} D.R. Hill Builders submitted the following jury instruction:

{¶ 14} "In addition to an express easement, Defendant D.R. Hill Builders, Inc., claims an easement to install the sanitary line by estoppel. To establish this claim, Defendants must prove the greater weight of the evidence that the Plaintiff allowed Defendants to spend money and effort in reliance on the existence of the easement claimed.

{¶ 15} "I instruct you that when an owner of land, without objection, permits another to expend money in reliance upon a supposed easement, the owner is estopped from denying the easement.

{¶ 16} "To establish estoppel, Defendant must establish:

{¶ 17} "1. Some type of representation, either by words, acts or silence, and the representation must be a factual one know [sic] to the party at the time he makes it, or, at best, the circumstances must be such that he is chargeable with knowledge of them;

{¶ 18} "2. The representation must communicate some fact or state of affairs in a misleading way;

{¶ 19} "3. The representation must induce actual reliance on the Defendant, and such reliance must be reasonable under the circumstance and made in good faith; and

{¶ 20} "4. The relying party will suffer prejudice or pecuniary advantage of the party whose representation was relied upon is not estopped or precluded from asserting an otherwise valid defense in contradiction to his earlier representation."

{¶ 21} This proposed instruction fully comported with the applicable law.

## B

{¶ 22} The defendants provided abundant testimony to create a jury question relating to the issue of easement by estoppel. There is no doubt that the parties negotiated terms for an easement. The evidence produced at trial included three letters ostensibly written by Prymas and addressed to Kassai. The letters were dated June 30, 1998. One letter appeared to be in draft form, with no letterhead or signature. It granted Kassai a "permanent easement" and further granted him "permission to install a permanent, forced main sanitary line as per the plans and specifications" prepared by Valley Ridge's engineer. As consideration for the easement, Kassai was to permit Prymas to tie in to the sanitary sewer.

{¶ 23} A second letter contained slightly different language and was written on "ETD" letterhead, listing the address of a Shell service station owned by Prymas. This letter did not contain a signature. Although Prymas conceded that this draft was written on his company letterhead, he claimed not to have written the letter and could not explain who would have. This letter contained terms similar to the first draft, but listed the address of the Marathon service station and noted that a permanent easement could be revoked by the current or future owners of the Marathon site.

{¶ 24} The third letter was a photocopy of the second draft. This letter contained Prymas's signature, although Prymas denied drafting or signing the letter. Again, he could not explain how his company letterhead had been misappropriated or how his signature appeared on the letter.

{¶ 25} In any event, Valley Ridge replied to Prymas by letter, also dated June 30, 1998, memorializing receipt of "your signed letter to Mr. Thomas Kassai, agreeing to the easement." The letter acknowledged that in exchange for the permanent easement, Valley Ridge would tie in existing sewers, repair the grade on an existing catch basin behind Prymas's building, remove the holding tank, and fill and compact the area. Valley Ridge then asked the city of Parma to expedite approval of its plans so that construction could commence.

{¶ 26} Prymas, who claimed all along that he had not agreed to the installation of the sewer line, testified to his "shock" at seeing the construction. Nevertheless, he testified that he told a worker who had bored the line under the storage tank that it was wrong "because they were supposed to be trenching it across my property as I was originally told." Prymas said that he tried to call Savel (Valley Ridge's point man on the project) and left messages for him, but did not actually speak to him. When asked why he did not walk next door to the construction project and complain, Prymas said, "I had other things to do." Prymas said that he called Kassai "towards the end of the year," but apparently did so with complaints not that the sewer had been installed across his property, but that the sewer had been bored into the ground rather than trenched. He also contacted the building department some two to three months after installation to complain not about the existence of the sewer line, but about how it had been installed.

{¶ 27} Prymas took no action on the alleged trespass for some time. In a letter dated September 9, 2002, he wrote to Dowd to complain that sewage "is currently discharged from your property across my property without my permission and in violation of my property rights." In a letter dated April 19, 2004, Prymas complained to Kassai and Dowd about a sewer backup into his toilets. Prymas also conceded that he made no demand to have the sewer removed until he hired an attorney.

{¶ 28} There was ample evidence to show that Prymas's sufferance of the sewer line led Valley Ridge to assume that it had his permission to place the sewer line. None of Prymas's actions immediately after discovering the existence of the line were consistent with his claim that Valley Ridge did not have his permission to place the line. In fact, the testimony fairly shows that he acquiesced to the placement of the sewer. He took no action to stop placement of the sewer. His only comment at the time was that the sewer was to have been trenched, not bored into his property. He made no complaint for months, and then only to protest about sewer backup on his property. Prymas's complaints were never about Valley Ridge running the sewer line without his permission— they were about Valley Ridge failing to install the line in a manner consistent with what he believed to be their agreement. This evidence does not show a lack of permission.

## C

{¶ 29} The court denied the requested instruction on easement by estoppel because it believed that resolution of the "permission" element of the trespass claim would necessarily answer the question of whether Prymas should be estopped from challenging the sewer line. In other words, the court believed that under either theory—trespass or easement by estoppel—Valley Ridge believed it had permission to enter upon the land. So the court apparently believed that if the jury found no permission such that a trespass had been committed, that finding that no permission existed would be equally applicable to a claim of easement by estoppel.

{¶ 30} The court's conclusion was erroneous because it conflated two separate concepts. Valley Ridge may not have had express permission to enter upon Prymas's land, but that fact is irrelevant to the estoppel claim. An estoppel claim is predicated on the lack of express permission. It rests on the reasonableness of a party's reliance on acts or inaction to determine whether permission to do an act existed. For example, even though Prymas testified that he had not granted an easement to Valley Ridge, there was evidence to show that he had agreed to permit the sewer line to run across his property. Savel testified that Prymas gave him the Shell Oil letterhead and that he drafted the letter according to terms dictated by Prymas. Although he did not see Prymas sign any of the letters, he testified that Prymas handed him an original, signed copy of a letter granting Valley Ridge permission to run the sewer line across the Marathon property. Savel expressly remembered obtaining permission from Prymas because he needed to meet a deadline set by the city planning commission.

{¶ 31} The court's failure to give the proposed instruction constituted an abuse of discretion because it severely prejudiced the defendants. Without the ease-

ment by estoppel defense, it left the jury to decide only whether the defendants trespassed on Prymas's property without the added justification shown by Prymas's failure to register any complaint both during construction and for months later. It was an all-or-nothing proposition that severely prejudiced the defendants. We therefore sustain the assignments of error relating to the court's failure to give a jury instruction on easement by estoppel and remand the cause for a new trial.

## II

{¶ 32} The evidence showed that on December 31, 2001, Valley Ridge agreed to sell the building to defendants Dowd and Zanoudakis through a trust established by them. Before purchasing the building, Dowd spoke with Prymas because he knew that Prymas was having issues relating to the sewer line. Counsel for Prymas then asked whether Dowd had demanded indemnity from Valley Ridge on the sewer issue. Over objection, the court permitted Dowd to answer that Valley Ridge had agreed to indemnify Dowd for any liability resulting from the sewer line. The defendants complain that the court abused its discretion by permitting the answer.

{¶ 33} Evid.R. 411 states:

{¶ 34} "Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership or control, if controverted, or bias or prejudice of a witness."

{¶ 35} The rule against admitting evidence of liability insurance merely codifies long-standing law designed to deter two evils. First, evidence of liability insurance is not particularly relevant, because having liability insurance does not make it more likely that a person will engage in negligent or other wrongful conduct. See 2 Wigmore on Evidence (Chadburn Rev.1976), Section 282a. Second, the rule guards against the possibility that a jury might return an inflated or exaggerated damage award to be paid by "a supposedly well-pursed and heartless insurance company that has already been paid for taking the risk." Id. at Section 282a(3); see, also, *Geddes v. United Fin. Group* (C.A.9, 1977), 559 F.2d 557, 560.

{¶ 36} The court abused its discretion by permitting Prymas to introduce evidence relating to the indemnity agreement between Dowd, Zanoudakis, and Valley Ridge. When ruling on counsel's specific objection that the question "deals with an indemnity agreement which affects insurance," the court replied, "I don't have any problems. Let's see where he is going." The court then asked

Prymas's counsel to "explain, for the jury, what indemnity is." Counsel told the jury that "an indemnity is in case Mr. Prymas were to sue you and recover a judgment against you, because you're using his land for discharge of your sewage." Counsel then had this exchange with Dowd:

{¶ 37} "Q. The person that's indemnifying you, namely, Valley Ridge, is going to compensate you and pay you everything that you suffer, isn't that right?

{¶ 38} "THE COURT: Is that your understanding of the indemnity?

{¶ 39} "A. Yes, it is.

{¶ 40} " * * *

{¶ 41} "Q. And as part of that indemnity, you don't have to pay any attorney expenses involved in this lawsuit; do you?"

{¶ 42} The cited testimony constitutes an egregious violation of Evid.R. 411. The court not only permitted counsel to mention the indemnity, it permitted counsel to define the term "indemnity" for the jury in terms very favorable to Prymas ("because you're using his land for the discharge of your sewage"). In addition, counsel for Prymas was able to inform the jury that Dowd would not be responsible for paying any attorney fees. Finally, the court permitted Prymas's counsel to point out that Dowd was using Valley Ridge's attorney as opposed to his own attorney and that Dowd did not have to pay Valley Ridge's attorney.

{¶ 43} Prymas's only rejoinder to these errors is to point out that an "indemnity" agreement is not the same thing as "liability" insurance since liability insurance involves two separate duties: the duty to defend and the duty to indemnify. Even if this were true, it is a distinction without a meaning in this case. Prymas not only pointed out to the jury that Dowd would be indemnified in the event of a judgment, he also pointed out that Dowd was not paying any attorney fees. So even if we accept Prymas' s definition of liability insurance, the facts show that the indemnity agreement in this case met his definition.

{¶ 44} We are, of course, aware that Evid.R. 411 permits evidence of liability insurance for other purposes. Prymas, however, makes no argument to that effect, and we see no valid argument on this point from the trial record. In the end, we are left with the firm conclusion that the admission of testimony relating to the indemnity agreement was not only impermissible, it significantly prejudiced the rights of Dowd and Zanoudakis because, as we will see shortly, the court did not use separate verdict forms that would have apportioned liability among the defendants. We therefore find that the court abused its discretion by permitting this testimony.

### III

{¶ 45} At the close of testimony, the court instructed the jury on Prymas's fraud claim and made it clear that the fraud claim was asserted only against D.R. Hill and "not Valley Ridge or the two doctors, okay." Based on this statement, the jury could not have awarded punitive damages for fraud against either Valley Ridge or the doctors. Nevertheless, the court submitted to the jury a general verdict form that permitted the jury to find an additional award for punitive damages against "Defendants." Both Valley Ridge and the doctors complain that this wording would have permitted the jury to enter a punitive damages award against them despite being told by the court that such an award be entered only against D.R. Hill.

{¶ 46} Civ.R. 51(A) states that "on appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." This is a codification of the appellate principle that "an appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ 47} On the record before us, we cannot conclude that Valley Ridge and the doctors properly objected to the use of the forms before they were submitted to the jury. However, the record shows that after the jury returned its verdict, counsel for Valley Ridge and the doctors asked the court to clarify against whom the findings were entered. The record shows that the court discussed the matter at sidebar and off the record. When the court went back on the record, it simply said, "We don't have a problem. Okay. So, thank you very much. You're excused."

{¶ 48} The court's response tells us nothing. It could mean that counsel for Valley Ridge and the doctors had no further objection to the verdict form. Or it could mean that the court was telling the jury that the legal issue addressed at sidebar had been concluded and there would be no further delays in discharging the jurors.

{¶ 49} We agree with this recent statement by the Second District Court of Appeals: "Common sense dictates that when competing theories of liability are advanced against separate defendants, separate verdict forms should be used." *Moreland v. Oak Creek OB/GYN, Inc.*, Montgomery App. No. 20468, 2005-Ohio-2014, 2005 WL 994595, at ¶ 15. In this case there were two theories of liability that could have supported an imposition of punitive damages: trespass and fraud.

While Valley Ridge and the doctors were exposed to liability for punitive damages on the trespass claim, they were not exposed to liability on the fraud claim. The general nature of the verdict form meant that Valley Ridge and the doctors could have been found liable for claims not made against them.[1]

{¶ 50} We would be remiss at this point if we did not consider this claim of error in conjunction with the erroneous admission of evidence relating to the existence of the indemnity between Valley Ridge and the doctors. There is the very real possibility that testimony relating to the indemnity agreement resonated with the jury to the point that it would have been immaterial to it whether liability had been found against the doctors. Indeed, Prymas inadvertently touches on this point by suggesting that specificity in the verdict forms was unnecessary since all defendants were exposed to punitive damages. This means, of course, that the jury could have apportioned damages without an express finding of liability on a particular count. That decision would have been easy to reach by knowing that the doctors would not pay anything out-of-pocket.

{¶ 51} Because the possibility of error is so great here, we find that the court erred by not ordering the jury to reach special verdicts on all counts.

## IV

{¶ 52} On the basis of the errors determined above, we order a complete retrial. The retrial necessarily moots the remaining assignments of error offered by the appellants, because they involve errors that are vitiated by a new trial.

## V

{¶ 53} For his first cross-assignment of error, Prymas complains that the court erred by granting summary judgment to Savel on the issue of his personal liability. Prymas sought to pierce the corporate veil of D.R. Hill to hold Savel personally liable for the tortious acts of the company.

{¶ 54} Pursuant to Civ.R. 56(C), the court shall not grant summary judgment unless, having construed the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. We review summary judgments de novo, with no deference to the court. *Mitnaul v. Fairmount Presbyterian Church*, 149 Ohio App.3d 769, 2002-Ohio-5833, 778 N.E.2d 1093, at ¶ 27.

---

1. Ironically, Prymas made this very point in his brief in opposition to D.R. Hill's and Savel's motion for summary judgment. Responding to the generic use of the words "defendants," Prymas stated, "It is not clear who is meant by the *Defendants*. Hill Builders and Savel? All *six* Defendants? Some of the six Defendants. Which ones? As will be seen later the 'who' is very important." (Emphasis sic.)

{¶ 55} Generally, an individual officer or shareholder will not be held liable for the acts or debts of a corporation. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 287, 617 N.E.2d 1075. An exception to this rule applies in cases when an individual shareholder possesses "(1) control over the corporation by those to be held liable was so complete that the corporation had no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." Id. at paragraph three of the syllabus.

{¶ 56} Prymas made no argument that Savel exercised the kind of dominion and control over D.R. Hill necessary to pierce the corporate veil. Indeed, the evidence conclusively showed that Savel was a vice president and field superintendent. Instead, Prymas argued that Savel would be personally responsible for the torts he committed.

{¶ 57} There is support for the proposition that "[d]irectors and corporate officers generally may be personally liable for fraud even though the corporation may be liable also." *Centennial Ins. Co. of N.Y. v. Vic Tanny Internatl. of Toledo, Inc.* (1975), 46 Ohio App.2d 137, 141, 75 O.O.2d 115, 346 N.E.2d 330. This liability extends to torts committed by or for the corporation when the officer has participated in the wrong. To find liability, the plaintiff must show that (1) the officer knew his statement to be false, (2) the officer intended the plaintiff to act upon it, and, (3) the plaintiff acted on the statement and, as a result, suffered injury. Id.; *R.J. Martin Elec. Contr. v. N. Am. Wire Prods. Corp.*, Cuyahoga App. No. 83850, 2004-Ohio-5971, 2004 WL 2537049.

{¶ 58} Prymas did not muster any evidence to show affirmatively that Savel had engaged in fraud. While he proceeded on the theory that Savel had somehow fabricated the negotiation letter, Prymas was forced to admit that the letters granting an easement to Valley Ridge existed on his letterhead and bore his signature. Prymas's mere denial of having signed the letter did not constitute affirmative evidence that Savel somehow engaged in fraud. This was not a case of forgery since Prymas conceded that the document bore his signature. Prymas simply could not explain how his signature appeared on the document, so he deduced that it must have appeared on the document by means of Savel's fraud. This is not evidence—it is rank speculation of a kind that is impermissible in summary judgment practice. There being no evidence of fraud, the court did not err by granting summary judgment to Savel.

## VI

{¶ 59} Finally, Prymas complains that the court erred by excluding evidence of his lost profits. He sought to submit evidence of the profits that he would have

earned had his service station been remodeled and expanded into a convenience store. The court granted a defense motion in limine on this point, presumably because Prymas could not establish lost profits with reasonable certainty.

{¶ 60} We summarily reject Prymas's argument because it is established at law that lost profits are not a component of damages for the tort of trespass in the absence of fraud, malice, or other circumstances justifying the recovery of punitive damages. *Cincinnati v. Evans* (1855), 5 Ohio St. 594, 603; *Horner v. Whitta,* Seneca App. No. 13–99–64, 2000 WL 1049309. On retrial, Prymas is entitled to make a case that the defendants committed a trespass with malice. If that showing is made, lost profits may be available to him. All of that is, however, subject to proof at retrial.

## VII

{¶ 61} Based on the foregoing, we reverse the jury verdict and remand this matter for a new trial. Any arguments not specifically addressed in this opinion are mooted by the new trial order.

Judgment reversed
and cause remanded.

COONEY, P.J., and BLACKMON, J., concur.