[Cite as *Garcia v. Ewais*, 2024-Ohio-3024.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

MARIA GARCIA,                              :

    Plaintiff-appellant,              :

v.                                                      :

                                                      :        No. 113272

ABDELJAWAD EWAIS, ET AL.,         :

    Defendants-appellees.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED IN PART; AFFIRMED IN PART; AND
REMANDED
**RELEASED AND JOURNALIZED:** August 8, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas,
Case No. CV-22-963518

---

*Appearances:*

Vargas & Elkhatib Law Co., LPA, and Kelly A. Rochotte,
*for appellant.*

ANITA LASTER MAYS, J.:

{¶ 1} Plaintiff-appellant Maria Garcia ("Garcia") appeals the bench trial judgment in this civil action against defendants-appellees Abraham Ewais ("Abraham") and his brother Abdeljawad Ewais ("A.J.").

{¶ 2} We reverse in part, affirm in part, and remand to the trial court for further proceedings pursuant to this opinion.

## I. Preliminary Matters

{¶ 3} As a preliminary matter, we observe that appellees failed to file appellate briefs before this court. Consequently, "this 'court may accept the appellant's statement of the facts and issues as correct and reverse judgment if appellant's brief reasonably appears to sustain such an action.'" *Smallwood v. Shiflet*, 2016-Ohio-7887, ¶ 8, fn. 1 (8th Dist.), quoting App.R. 18(C).

{¶ 4} "App.R. 18(C) does not impose a form of appellate default judgment where the court of appeals can reverse solely because the appellee failed to file a brief." *In re S.M.T.*, 2012-Ohio-1745, ¶ 3 (8th Dist.). Reversal is warranted only if the arguments in the appellant's brief reasonably appear to support a reversal.[1]

## II. Background and Facts

{¶ 5} In September 2020, Garcia closed the purchase of a single-family residence located on West 47th Place in Cleveland, Ohio (the "Property"). The sales listing advertised that the Property included a "freshly poured [cement] driveway" that "allows enough space for multiple vehicles to park side by side if desired." The driveway was 18 feet wide and extended from the base of the single-family residence

---

[1] An "appellee will not be heard at oral argument except by permission of the Court upon a showing of good cause submitted in writing prior to argument; and in determining the appeal, the Court may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action." App.R. 18(C).

on the Property to the base of the single-family residence of the adjacent property to the north owned by appellee A.J. ("A.J.'s Property"). The driveway apron began at the street and extended to the rear of the properties. Garcia observed that the mortgage location survey reflected that the driveway was part of the parcel and was included as part of the mortgage loan and appraisal.[2] Though there was no garage, Garcia would not have purchased the Property without a driveway for parking and a play area for her children.

{¶ 6} The Property was gifted to appellee Abraham in 2012 by Khalil Ewais ("Khalil"), brother to Abraham and A.J., a civil engineer who owned rental properties in the area. Appellee A.J., also an engineer, owned rental properties in the area including A.J.'s Property. Abraham installed the driveway in 2019 or spring 2020 with A.J.'s consent to provide parking for the Property and to waterproof the basements of both properties.

{¶ 7} After closing, tensions arose between A.J., Garcia, and A.J.'s tenant over the use of the driveway. The tenant used the driveway portion beside A.J.'s house as a patio and for garbage can placement. The driveway to A.J.'s Property was located on the northern side of his property and the tenant parked on the street in front of his property in a handicapped space. A.J. claimed he told Garcia that the entire driveway did not belong to her.

---

[2] A mortgage location survey is solely for the  use of a title insurer or mortgagee while a boundary survey is used to establish boundary lines. *State Farm Ins. Cos. v. Peda*, 2003-Ohio-1092, ¶ 17-19 (11th Dist.), citing Adm.Code, Ch. 4733-33 and 4733-37.

{¶ 8} More than a year after closing, boundary surveys revealed that A.J.'s property line extended to more than one-half of the driveway. A.J. had an eight-foot wooden fence bolted onto the length of the driveway marking his property line, leaving Garcia just enough space to pull the front portion of her automobile into the driveway. Pulling further into the driveway would not permit her car doors to open. The back of her car extended over the sidewalk.

{¶ 9} On May 17, 2022, Garcia filed suit against appellees for (1) trespass, (2) temporary injunction/ breach of easement; (3) conversion; (4) fraud; and (5) civil conspiracy to commit fraud by the Ewaises.[3] Garcia requested punitive damages and attorney fees and claimed entitlement to an equitable easement based on the permanent nature of the driveway, A.J.'s agreement to the construction of the driveway, and mutual knowledge and intent of A.J. and Abraham regarding the use. Abraham and A.J. denied the claims. A.J. counterclaimed for trespass and conversion.

## III. Trial

{¶ 10} Trial commenced on September 18, 2023.

### A. Realtors

{¶ 11} Abraham's real estate agent Kaylee Battaglia ("Battaglia") prepared the listing narrative, had photographs taken, and placed the listing. The listing advertised the freshly paved driveway as Battaglia said "it was one of the best aspects

---

[3] The motion for preliminary injunction was withdrawn on September 8, 2022.

of the house." Tr. 23. "Because there was no garage. So that was a big point." Tr. 24. Battaglia stated the Property would have been listed for a lower price without the driveway and the appraisal would have been lower.

{¶ 12} Battaglia was familiar with the area where the property was located. "I can tell you that not having a driveway makes a huge impact. It's not exactly the safest place. It's a — I mean, it's a one-way street on the west side of Cleveland, kind of in not the best area. So I do think that that played a big part of it." Tr. 24.

{¶ 13} Battaglia read the text she received from Abraham that conveyed the property information included in the listing:

> Address is . . . West 47th Place Cleveland, Ohio, 44102. 3–4-bedroom house for sale. Newly remodeled. New roof, siding, windows, hardwood floors, carpet, new electrical, plumbing, freshly painted, steam heat, *new driveway*, 1 and half bath, fenced in, and a basement.

(Emphasis added.) Tr. 27. Battaglia discussed the driveway and lack of a garage with Abraham several times who assured her the driveway was part of the Property.

{¶ 14} The published listing advertised:

> Turnkey ready home in an up-and-coming neighborhood! If you're looking for space, look no further. This charming colonial has been completely t0 [sic] refinished from top to bottom. Pull into your freshly poured driveway that allows enough space for multiple vehicles to park side by side if desired.

Tr. 28. Abraham reviewed a screen shot of the listing and photographs to confirm the accuracy and said it was perfect. Tr. 40.

{¶ 15} Battaglia was never told that a portion of the driveway belonged to anyone else.

The only thing that came up was when the neighbors had their garbage cans on that driveway. And I don't remember if it was the final walk-through or maybe inspection. For whatever reason the buyer was there. That's typically the only two points that they're there before the close. And I did mention it to [Abraham], and he sent me a picture back saying that everything was clear and that the neighbors moved their stuff. Outside of that, we never spoke about it.

Tr. 29.

{¶ 16} Battaglia texted Abraham on August 13, 2020, "[i]t is so strange" that the back door of A.J.'s Property exited into the driveway. Tr. 32. She did not know who the owner was at the time. Abraham explained that the two- or three-foot pathway along the dwelling was typical and allowed work to be done on the house. Battaglia did not find that unusual, particularly since Abraham assured her the entire driveway belonged to the Property.

{¶ 17} Garcia's agent, Amanda Mortach ("Mortach"), was employed by the same brokerage firm. Mortach testified she saw the trash cans from A.J.'s Property in the driveway and confirmed with Battaglia that the entire driveway would belong to Garcia. After closing on the purchase, Garcia told Mortach that the neighbor said the entire driveway was not hers.

{¶ 18} Mortach confirmed that the seller's residential property disclosure form stated there had been no boundary change, there were no encroachments, and the driveway was not shared. Mortach relied on the disclosure and the information provided by the listing agent.

{¶ 19} Mortach was familiar with the mortgage location survey that contained a disclaimer stating it was not a boundary survey and may not show all

easements that affected the subject tract per Adm.Code 4733-38.[4]  Tr. 54. The mortgage location survey contained a red highlighted area that said, "Encroachment. Subject's driveway encroaches over property line approximately 4.7 feet."  Mortach explained that the rear of the driveway encroached on the parcel behind the Property and A.J.'s Property. There was no indication that the Property's driveway encroached onto A.J.'s Property.

{¶ 20} Sabrina Semidey ("Semidey"), the real estate company team leader for Mortach and Battaglia, provided general guidance to the realtors but became more involved after closing.[5]  Garcia called the office to report that someone was installing a fence in her driveway though it was her understanding the driveway belonged to Garcia.  Semidey went to the Property and saw a permit for the fence posted on the window of A.J.'s Property.  Research revealed that several individuals with the last name Ewais owned properties in the area.

{¶ 21} The Property was listed for $93,500, sold for $93,000, and Abraham contributed $5,000 toward closing costs.  "If there was no driveway, I would probably have priced this at, like, $85[,000]."  Tr. 92. "Nobody wants to buy a house with no driveway." Tr. 93.  Semidey had never encountered a similar situation.

---

[4] Adm.Code 4733-38(O) lists standards for mortgage location surveys. "A statement shall appear on the plat indicating that the survey is a mortgage location survey prepared in accordance with Chapter 4733-38 of the Administrative Code, and is not a boundary survey pursuant to Chapter 4733-37 of the Administrative Code." Adm.Code 4733-38-05(O).

[5] Each agent provided their respective client with a dual agency disclosure that is required by law where the agents of the parties work under a common brokerage firm.

**B. Appraiser**

{¶ 22} Real estate appraiser Shelby Evans ("Evans") appraised the Property in 2020 and reappraised it in January 2023. No boundary survey was provided for either, but a survey was not typically "provided in the normal course of business." Tr. 99.

{¶ 23} Evans only appraised the exterior in 2020 due to COVID. Based on the plat sketch posted on the county's website and the appearance of the driveway, Evans assumed that one-half of the driveway belonged to the Property, though the listing information in the description area of the appraisal included the sentence: "Pull into your freshly poured driveway that allows enough space for multiple vehicles to park side by side if desired."

{¶ 24} Evans explained that indications of a shared driveway would have appeared on the listing, a survey or title company information, and the driveway usually splits off in a shared driveway. The 2020 appraised value was $94,000. The appraisal would have been reduced by $3,000 without a driveway.

{¶ 25} The 2023 appraisal value was $100,000. The driveway fence allowed a vehicle to pull partially into the driveway but not to open the vehicle doors — at least two more feet would be required. The value with a driveway would have been $103,000 more.

{¶ 26} Evans also prepared an appraisal for the Property that included a value for the entire 18-foot cement driveway, but the copy was not in the trial exhibit book, and she could not remember the amount.

### C. Appellant Garcia

{¶ 27} Garcia testified that her real estate agent brought the Property to her attention. "When I first went to go see the house, the garbage cans of the neighbor was in the driveway [on A.J.'s side], and I was very adamant with the [real estate agents] in telling them that I didn't want a shared driveway, and they kept stressing to me that they have talked to the seller and he assured them that the driveway was mine and that [the neighbor] was just using it." Tr. 119.

{¶ 28} Garcia chose the Property due to its convenient location near family and the freeway, but would not have purchased the Property without a driveway. "[I]t's a big factor for me. There's no — there's barely any parking [on the street]. It's a one-way street. My kids play in the driveway. They have bikes, basketball hoops. It was — it was ideal for me and my two children." Tr. 119-20.

{¶ 29} The mortgage location survey did not indicate an irregularity or encroachment onto A.J.'s Property — only that the back of the driveway encroached 4.5 feet onto the parcels behind the properties. To Garcia's knowledge, A.J.'s driveway was on the other side of his property and the tenant in A.J.'s property did not use the driveway for parking.

{¶ 30} Garcia initially had a good relationship with the tenant, but conflicts arose over the use of the driveway. Garcia attempted to contact A.J. about the issue. On October 25, 2021, at the suggestion of an attorney friend, Garcia sent a letter to A.J. at A.J.'s Property along with a copy of the mortgage location survey showing the driveway as part of the Property, but A.J. did not reply. Garcia said that A.J. was

physically present in the area and reportedly resided about six houses down the street, but Garcia could not find A.J. listed at the address. A.J. was present when the fence was installed about four months later and told Garcia that he did not respond to her letter because he did not have to.

{¶ 31} At Semidey's suggestion, Garcia reached out to the Cleveland building department. She was informed that no prior records existed for the Property and no driveway or construction permits had been granted.

{¶ 32} Parking availability was scarce, and Garcia encountered problems with the police because the rear of her car extended over the sidewalk. Her car was stolen in November 2022 and recovered four months later. Garcia would not have purchased the house without a driveway and asked that the fence be removed.

> I just feel like — that it's just unfair. I feel like I have been conned one way or another and it's just a game that I've been playing since I bought this house. And I bought the house as a gift for me and my kids, not to argue for three years. It's been literally six months after [sic] I bought this house I have been dealing with this, for two-and-a-half years.

Tr. 134.

{¶ 33} Garcia was not concerned about the rear encroachment, "because I was assured that . . . when they laid the driveway, they asked for that permission." Tr. 139. Garcia drove by the Property about five times prior to closing. Each time she saw the tenant using the driveway she contacted the realtors who told her the tenant "was using it because nobody was living" at the Property. Tr. 139.

{¶ 34} Garcia affirmed during cross-examination that the realtors sent her the paperwork including the mortgage location survey when she qualified to

purchase the home. Garcia did not know the difference between a mortgage location survey and a boundary survey. She saw the lot width dimensions and believed the remaining approximately eight feet for the newly poured driveway was sufficient for parking and she would be able to get out of the car. When she saw that the rear area encroached on the lot behind the driveway, Garcia "questioned everybody about that" and she was assured that "they asked for that permission." Tr. 138.

{¶ 35} Garcia indicated on a photo exhibit of the driveway and fence that "[b]efore the fence was erected, there was two poles, one on [A.J.'s] side and one on mine [in front of the basement window]." Tr. 142. She measured the spacing between the poles that indicated her portion of the driveway was ten to 11 feet, but the boundary survey Garcia purchased in January 2023 showed the driveway space was 7.5 feet.

{¶ 36} Garcia confirmed she was told prior to purchase that the driveway was a "side-by-side driveway" and learned that was not true "after the fact." Tr. 146, 148. As a first-time buyer, Garcia was relying on the information provided by the seller, realtors, and mortgage loan survey. Garcia met A.J. the night of Garcia's housewarming and told him she had just purchased the Property. A.J. did not tell her that she did not own the entire driveway, nor did he contact her or show her the boundary survey that he commissioned until after he installed the fence.

### D. Appellee A.J.'s tenant

{¶ 37} A.J.'s tenant testified she resided at A.J.'s property for 21 years and referred to A.J.'s portion of the driveway as her patio. The tenant did not park in the

driveway to A.J.'s Property located on the opposite side of the residence but had a handicapped permit that allowed her to park in front of the house. The bulk of the testimony recounted the negative interactions between the tenant and Garcia regarding use of the driveway.

### E. Appellee A.J.

{¶ 38} A.J. testified that he first met Garcia at her housewarming yard party when she moved into the house in September 2020. "When they first closed in buying the house, she was so happy, excited. She had a bottle of wine in her hand, you know, to celebrate and everything." Contrary to Garcia's testimony about the housewarming, A.J. said he "went over to her and I explained to her, you know, I just want to be nice to you. The whole thing is not yours. This whole — you know, this whole pad is not hers." Tr. 183. "[M]y only condition was . . . just don't bother my tenant and you guys get along. I don't care." Tr. 184.

{¶ 39} After ongoing encounters between Garcia's household and the tenant regarding use of the driveway, A.J. told Garcia, "You know this is not yours, and she's like: No, I have proof. And she brought me pictures from Google Earth showing me before . . . the pad was constructed, there was a little concrete" on either side of each house "and the middle [area in between the two houses where the driveway was installed] was grass. And she said . . . this is only mine, and I'm, like: No, that's not true." Tr. 184-185.

{¶ 40} A.J. decided to have a boundary survey conducted "[j]ust to prove to Garcia" that the driveway did not belong entirely to her. Tr. 185. The surveyor was

David Bruckner, and it contained the date of January 28, 2021. A.J. confirmed his counsel's statement that the survey revealed that Garcia owned 7.5 feet of the concrete pad and he owned 10.5. A.J. contended his survey gave Garcia an additional inch or two compared to Garcia's survey. The fence was constructed to prevent the possibility of physical altercations and because his tenant threatened to move.

{¶ 41} A.J. verified his driveway was on the opposite side of the house and he had no reason to "make a shared driveway." Tr. 197. A.J. and the tenant "always looked at the concrete driveway "as a pad. . . . [I]t helps both houses. . . . These houses, they leak water sometimes. This helps stop the leaks you know. It didn't stop it a hundred percent. I would say it helped maybe 70 percent on my side." Tr. 198.

{¶ 42} A.J. believed the driveway was poured about three months before Abraham sold the house. They did not discuss an easement. A.J. heard Abraham was selling the house from their mother who also lived in the area. Their mother inquired of A.J., "Your brother parks away from the house. Can you, you know, let him park in there? And I'm, like: Fine. That's okay. He's my brother." Tr. 200. Though he testified at the deposition that he discussed the driveway with Abraham, he could not recall doing so.

{¶ 43} A.J. claimed that, as an engineer, he knew that "for one car to be parked in" Garcia's portion of the driveway, "you would need another two feet, if not more. Then you would need another two feet on each side to be able to open the

doors. I'm an engineer, and I — I do — you know, I know about this stuff." Tr. 200. Asked whether Garcia needs more room to use her side as an actual driveway, A.J. responded, "That's not my problem. Sorry to say that. Exactly that's what she [would] need." Tr. 214.

{¶ 44} A.J. said he lives in the Middle East and travels to Cleveland to visit family and pay taxes. When in Cleveland, he stays in one of his rental units located down the street from the properties. A.J. knew that Khalil owned the Property prior to Abraham.

{¶ 45} During cross-examination, A.J. said he did not recall talking to Abraham about the driveway, though at deposition he testified that he did. A.J. confirmed that he noticed that Abraham was pouring the cement driveway at the time of the construction but did not assert his property line.

### F. Appellee Abraham

{¶ 46} The final witness was Abraham whose ownership of the Property began in 2012 when his brother Khalil gifted the house to Abraham. Contrary to A.J.'s testimony that the driveway was installed a few months before the 2020 Property sale, Abraham said he believed the driveway was poured in April 2019 or May 2019. He decided to finance the installation of the 18-foot cement driveway because he "wanted to seal off the basements" of the properties "to make them waterproof." Tr. 220.

{¶ 47} Regarding the parking motivation for the installation, Garcia's counsel inquired:

Counsel:  Okay. And you decided to pour the driveway because there was no parking on that parcel; is that correct?

Abraham:  No, I wanted to seal both sides of the houses.  I wanted to waterproof the houses.

Counsel:  Okay. I'm going to introduce Plaintiff's Exhibit No. 17, which is your deposition, page 21, line five:

You testified that you decided to pour a driveway because there was no parking on that parcel. Would you like to amend your current testimony?

Abraham:  I mean, I did it for a driveway and to seal both basements.

Counsel:  Okay.  So you did it because there was no driveway on that parcel a partial reasoning for pouring the driveway?

Abraham.  Partial reasoning.

Tr. 233.

{¶ 48} Abraham executed the residential disclosure form and indicated in the purchase agreement that the Property was sold as is.  He confirmed checking the box on the Residential Disclosure Form that indicated he had no knowledge of a boundary agreement, boundary dispute, recent boundary change, shared driveway, party walls, or encroachments from or on the adjacent property.[6]  He did not indicate that the driveway was shared on the real estate disclosure form because "[e]veryone has their boundaries that they own" though he did not know the boundaries of the properties until the lawsuit ensued.  Tr. 236.  He stated that those

---

[6] This court observes that the form also indicates Abraham had no knowledge of prior or current flooding or drainage problems though the cement driveway was installed for parking and waterproofing.

representations were still correct. Abraham also affirmed signing the general warranty deed.[7]

Abraham sent the July 27, 2020 text message to the realtor that lists a description of the Property features including a "new driveway." The realtor called while he was at a meeting and asked him to look at the text description of the Property listing that she prepared that included the new driveway. "I felt pressured to read it real quick and answer back to her." Tr. 228. He did not deny approving the "new driveway" language but stated he did not approve the language that the driveway "allows enough space for multiple vehicles to park side by side." Tr. 229.

{¶ 49} On August 13, 2020, the realtor texted regarding A.J.'s Property that "[i]t is so strange that their back door goes to the driveway too[.]" Abraham read his response:

> That leads to the back of their house. There is a path that goes to the back.
>
> The next door house also has 2 or 3 feet on the side of their house as a walkway in case work needs to be done on their house, like roof work or siding, et cetera. That['s] standard for any house.

Tr. 225.

{¶ 50} Abraham understood that the $93,500 purchase price was for the house including a driveway and that the driveway would be used by the buyer. Abraham did not know the exact Property boundaries, never spoke with Garcia, and

---

[7] A review of the warranty deed reflects that the warranty excepted coverage for "encroachments *as do not materially adversely affect the use* or value of the property." (Emphasis added.)

said he never intended to mislead. He hired a construction company for the driveway installation and did not know anything about a permit nor that the rear of the driveway encroached four and one-half feet onto the rear property.

{¶ 51} Abraham stated he did not discuss installing the driveway directly with A.J. but communicated through their mother. "And I told her: Hey, I'm going to pour a driveway. I'm going to pay the full thing. And then she talked to my brother, and then he got — she got back to me, told me: then he's okay with it." Tr. 221. At the deposition, Abraham testified that he discussed pouring the driveway directly with A.J.

{¶ 52} The trial court found Abraham liable for fraud and awarded $8,000 in damages. The remaining claims by the parties were denied.

> On counts one, two, three, and five of plaintiff's complaint, the court enters judgment in favor of defendants. The court also enters judgment in favor of defendants on plaintiff's claim for punitive damages and attorney fees.
>
> The court enters judgment in favor of plaintiff on defendant Abdeljawad Ewais's counterclaims.
>
> The court enters judgment in favor of plaintiff and against defendant Abraham Ewais on plaintiff's claim for fraud (count four of the complaint).
>
> Judgment is granted in favor of plaintiff Maria Garcia against defendant Abraham Ewais in the amount of $8,000.00 plus interest at 5.00% per annum from the date of judgment and court costs.

Journal Entry 159299043 (Sept. 25, 2023).

{¶ 53} Garcia appeals.

## IV. Assignments of Error

{¶ 54} Garcia assigns the following errors:

I. The trial court erred when it denied any finding of an equitable easement in appellant's favor.

II. The trial court erred when it did not issue any findings in support for its damages award for fraud.

## V. Analysis

### A. Equitable easement

### 1. Standard of Review

{¶ 55} An easement by estoppel must be established by clear and convincing evidence, and we review whether the finding that Garcia did not establish such an easement is against the manifest weight of the evidence. *Fling v. Daniel*, 2019-Ohio-1723, ¶ 26 (4th Dist.), citing *Pinkerton v. Salyers*, 2015-Ohio-377, ¶ 17-18 (4th Dist.).

{¶ 56} "Clear and convincing evidence" is a measure of proof that is more than a mere "preponderance of the evidence." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal*." (Emphasis in original.) *Id.*, citing *Merrick v. Ditzler*, 91 Ohio St. 256 (1915). Manifest weight is a question of fact. *State v. Thompkins*, 78 Ohio St. 380, 387 (1997). In a manifest weight analysis, an appellate court "reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and . . . resolves conflicts in the evidence." *Id.*

## 2. Discussion

{¶ 57} Garcia states that the permanent nature of the cement driveway installed by Abraham with A.J.'s agreement to provide a driveway for the Property for Abraham to park and to waterproof the basements of both properties created an equitable easement. This court finds that the argument has merit.

{¶ 58} "'An easement is the interest in the land of another . . . that entitles the owners of the easement, the dominant estate [in this case Garcia as owner of the Property], to a limited use of the land in which the interest exists, the servient estate [A.J.'s Property].' (Citations omitted.)" *Slosar v. Homestead Creek Homeowners Assn.*, 2011-Ohio-4420, ¶ 26 (8th Dist.), quoting *Crane Hollow, Inc. v. Marathon Ashland Pipe Line, LLC*, 138 Ohio App.3d 57, 66 (4th Dist. 2000).

{¶ 59} "An easement may be created 'by grant, implication, prescription, or estoppel.'" *Gateway Park, LLC v. Ferrous Realty, Ltd.*, 2008-Ohio-6161, ¶ 29 (8th Dist.), citing *Kamenar R. S., Inc. v. Ohio Edison Co.*, 79 Ohio App.3d 685, 689 (3d Dist. 1992). An express easement may be granted by deed or "'[t]he grant may also be included in the language of a lease or similar document.'" *Acorn Dev., LLC v. The Sanson Co.*, 2022-Ohio-2576, ¶ 15 (8th Dist.), citing *Kamenar* at 689, citing 36 Ohio Jur.3d, Easements and Licenses, § 18 (1982).

{¶ 60} Easements may also be created by implication, prescription, or estoppel. *Id.*, citing *Miller v. Romanauski*, 2014-Ohio-1517, ¶ 17 (8th Dist.), citing *Gateway Park, LLC* at ¶ 29. Garcia argues that a grant of easement by estoppel, also known as an equitable easement, is the correct legal remedy in this case.

{¶ 61} The easement by estoppel doctrine in Ohio applies where "'an owner of land, without objection, permits another to expend money in reliance upon a supposed easement, when in justice and equity the former ought to have disclaimed his or her conflicting rights.'"[8] *Prymas v. Kassai*, 2006-Ohio-3726, ¶ 12 (8th Dist.), quoting *Arkes v. Gregg*, 2005-Ohio-6369, ¶ 28 (10th Dist.). "'The party seeking to establish an equitable easement must show (1) a misrepresentation or fraudulent failure to speak, and (2) reasonable detrimental reliance.'" *Id.*, quoting *id*. *See also Safran Family Trust v. Hughes Property Mgt.*, 2018-Ohio-438, ¶ 17 (6th Dist.) ("[A]n easement by estoppel arises when 'an owner of property misleads or causes another in any way to change the other's position to his or her prejudice.'" [Citations omitted.").

{¶ 62} While courts are generally reluctant to find an easement by estoppel based on, for example, passive acquiescence, "'[i]f injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when: (1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the

---

[8] While "research has not revealed any cases in which the Supreme Court of Ohio has explicitly or implicitly recognized easements by estoppel, it has also not revealed any cases in which that court declined to recognize such an easement despite the presence of actual or constructive fraud." *Fling v. Daniel*, 2019-Ohio-1723, 130 N.E.3d 319, ¶ 21 (4th Dist.). If an owner fails to object, the owner is estopped to deny the easement. *Id.* The purpose of equitable estoppel is "'to prevent actual or constructive fraud and to promote the ends of justice.'" *Id.* at ¶ 23, citing *Doe v. Archdiocese of Cincinnati*, 2008-Ohio-67, ¶ 7, quoting *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145 (1990).

permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief . . . .'" *Id*. at ¶ 10, quoting Restatement of the Law, 3d, Property, § 2.10, at 143 (2000).

{¶ 63} Garcia cites *McCumbers v. Puckett*, 2009-Ohio-4465 (12th Dist.), in support of her position. The Twelfth District affirmed the trial court's grant of an easement by estoppel. The Pucketts owned real property immediately south of the McCumberses' property and a strip of land that ran "along the eastern boundary of McCumberses' property and extend[ed] to the Pucketts' property." *Id*. at ¶ 1. The Pucketts and predecessors to the McCumbers shared the cost to install a driveway on the strip that benefited both properties.

{¶ 64} The relationship between the parties deteriorated. The McCumbers hired someone to pave an approach to their new garage that connected to the driveway strip. The Pucketts threatened to construct a fence along the driveway that would block access to the McCumberses' new garage. The McCumbers filed suit and alleged they possessed an easement under the doctrine of adverse possession, prescriptive easement, and/or easement by estoppel. *Id*. at ¶ 7.

{¶ 65} The trial court relied in part on Restatement of the Law 3d, Property, § 2.10 (2000), entitled "Servitudes Created by Estoppel" in granting the easement that states in pertinent part:

> "If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when:

"(1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on the belief[.]"

*McCumbers*, 2009-Ohio-4465, ¶ 18-20 (12th Dist.).  *See also Prymas*, 2006-Ohio-3726, ¶ 10 (8th Dist.), quoting Restatement, § 2.10 at 143.

{¶ 66} In addition, the *"[f]ailure to object to an investment made in improvements to land by another may give rise to an estoppel against the owner or occupier of the land, if the owner or occupier knows or reasonably should know that the investment is being made on the basis of a mistaken belief that the investor has a nonrevokable right to use the land."* (Emphasis in original.)  *McCumbers* at ¶ 21.   Restatement of the Law 3d, Property (Servitudes), §2.10, Comment e (2000).

{¶ 67} A.J., an engineer and experienced real estate investor, as the owner of the servient parcel, agreed that Abraham, the owner of the dominant parcel, could finance and install a permanent 18-foot-wide concrete driveway to serve as a driveway for the Property, and to waterproof both properties that A.J. testified benefited his property.[9]   A.J. and Abraham testified that they did not know the boundaries of the properties until the surveys were taken approximately two years after Garcia's purchase.  A.J. also testified that he did not assert his property line until after Garcia purchased the Property.

---

[9] *See Shanks v. Floom*, 162 Ohio St. 479, 484 (1955), considering the permanence and nature of an improvement constructed of concrete on the boundary line of neighboring properties to substantiate an element of a prescriptive easement, which also requires use over a period of time, versus a merely permissive use.

{¶ 68} Thus, A.J. expressly agreed that Abraham could expend money to install a permanent structure for parking for the Property in reliance on what constitutes an equitable easement "'when in justice and equity'" A.J. "'ought to have disclaimed his . . . conflicting rights.'" *Prymas*, 2006-Ohio-3726, at ¶ 12 (8th Dist.), quoting *Arkes*, 2005-Ohio-6369, at ¶ 28 (10th Dist.).

{¶ 69} A subsequent owner of realty as "one who is in privity with another because of the transfer of property 'stands in the same shoes' as to the rights of the prior owner of the same property, thereby giving the subsequent owner the same rights and obligation as the original owner had in regard to the property." *Berardi v. Ohio Turnpike Comm.*, 1 Ohio App.2d 365, 370 (8th Dist. 1965).

{¶ 70} Abraham sold the Property with a newly poured driveway. No construction permit was secured. There was no public record or other indication that a boundary issue existed impacting the driveway. The trial court entered judgment against Abraham for fraud. Garcia, as the successor owner of the dominant parcel, expended money to purchase the Property with a driveway as represented without notice of the boundary issue.

{¶ 71} The Property appraisal was based on the inclusion of the driveway and the listing included a driveway. The residential disclosure statement specifically disclaimed encroachments "from or on [the] adjacent property," boundary disputes or agreements, or that the driveway was shared. Garcia is left without a functional driveway that is not fit for the purpose represented or intended. A.J. agreed to the installation, his property benefited from the installation, and he failed to exercise his

boundary rights prior to Garcia's purchase. A party must show a misrepresentation or fraudulent failure to speak in addition to a reasonable detrimental reliance to establish an equitable easement. *See Prymas*, 2006-Ohio-3726, ¶ 12 (8th Dist.); *Arkes*, 2005-Ohio-6369, ¶ 28 (10th Dist.).

{¶ 72} We reiterate that while courts are generally reluctant to find an easement by estoppel based on, for instance, passive acquiescence, the agreement between A.J. and Abraham was expressed.

> "[I]f injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when: (1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief . . . ."

*Prymas,* 2006-Ohio-3726, at ¶ 10 (8th Dist.)*,* quoting Restatement of the Law 3d, Property, at 143 (2000). We find this is one of those cases.

{¶ 73} It would be "unconscionable" to deny an easement by estoppel sufficient to allow Garcia to park in the driveway, open the car doors, and to otherwise enjoy a reasonable use of the driveway. S*ee McCumbers*, 2009-Ohio-4465, ¶ 22 (12th Dist.).

{¶ 74} Based on a thorough review of the record, we find that it clearly and convincingly shows that Garcia has established the elements of an easement by estoppel and the judgment is against the manifest weight of the evidence.

{¶ 75} Garcia has requested that the fence be moved back to allow her an additional four feet for parking and use of the driveway, the amount of footage that

A.J. stated he knew as an engineer would be required. We remand the case to the trial court for the limited purpose of establishing the width of the easement to allow the additional footage for Garcia's reasonable use of the driveway to park, open the car doors, and exit the vehicle and order that the fence be removed to the boundary of the easement.

{¶ 76} The first assignment of error is sustained.

### B. Fraud

{¶ 77} In the second assignment of error, Garcia contends the trial court did not issue findings and support for the amount awarded as damages for fraud. The trial court awarded $8,000 for fraud by Abraham without further explanation, and Garcia asserts it does not compensate her for breach of contract for the nondisclosure or attorney's fees for the fraudulent conduct.

{¶ 78} The sole case law offered to support the argument sets forth the elements of fraud. App.R. 16(A)(7) requires that Garcia include the following in her brief: "An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." *Baxter v. Thomas*, 2015-Ohio-2148, ¶ 55 (8th Dist.). It is not the duty of this court to root out an argument in the event it exists to support this assignment of error. *Id.*, citing *Citta-Pietrolungo v. Pietrolungo*, 2005-Ohio-4814, ¶ 35 (8th Dist.), quoting *Cardone v. Cardone*, 1998 Ohio App. LEXIS 2028 (9th Dist. May 6, 1998).

{¶ 79} The second assignment of error is overruled.

## VI. Conclusion

{¶ 80} The first assignment of error is sustained, the trial court's judgment denying an equitable easement is reversed, and the case is remanded for the sole purpose of establishing the width of the easement by estoppel for the driveway and ordering removal or relocation of the fence to the established easement boundary. The second assignment of error is overruled. The remainder of the judgment is affirmed.

It is ordered that costs are divided equally between the parties.

The court finds that there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MARY EILEEN KILBANE, P.J., CONCURS;
LISA B. FORBES, J., CONCURS IN JUDGMENT ONLY